**ALLIANCE TO END REPRESSION, et al., Plaintiffs-Appellees,**

v.

**CITY OF CHICAGO, Defendant-Appellant.**

No. 86–2609.

United States Court of Appeals, Seventh Circuit.

Argued April 10, 1987.

Decided May 26, 1987.

Sharon Baldwin, Acting Corp. Counsel, Chicago, Ill., for defendant-appellant.

Richard M. Gutman, Richard Gutman, P.C., Chicago, Ill., for plaintiffs-appellees.

Before BAUER, Chief Judge, and POSNER and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

The City of Chicago spied on and infiltrated several organizations of political dissidents. The organizations and some of their members claimed that the infiltration and subsequent adverse publicity violated their rights under the first amendment to the Constitution, applied to the states through the fourteenth. In 1975 the City stopped the infiltration and abolished the unit of the Police Department that had been responsible for it. In 1981 the City consented to the entry of an injunction against investigation and infiltration in the absence of reasonable grounds to believe that the targets are violating or likely to violate the law. *Alliance to End Repression v. City of Chicago*, 561 F.Supp. 537 (N.D.Ill.1982). The federal government consented to similar relief. *Alliance to End Repression v. City of Chicago*, 91 F.R.D. 182 (N.D.Ill.1981), 561 F.Supp. 575 (1983) (injunction implementing decree), reversed, 742 F.2d 1007 (7th Cir.1984) (en banc).

The plaintiffs wanted damages as well as an injunction. One group of plaintiffs agreed with the City that the organizations would accept $20,625 and the individuals $10,000 apiece. The plaintiffs in all pending actions accepted this, with five exceptions: the Alliance to End Repression, the Chicago Peace Council, William Hogan, Lucy Montgomery, and A.A. (Sammy) Rayner, Jr. These five were happy with the money offer and the terms of the injunction but also wanted a judicial declaration that their rights had been violated. The parties discussed the possibility of the City's adding a confession of misconduct to the money and injunction, but they could not agree. The lawyer for these five plaintiffs explained in open court:

THE COURT: If the City were to agree that the conduct of the Red Squad in the mid–60s was in fact unconstitutional, would that satisfy you?

MR. GUTMAN: If we could do it in a form—our damage claims are secondary. If we could have that in a form that would serve as a legal precedent—for example, if they did not contest that part, and we might agree to limiting the damages, as long as it was something that would serve as a legal precedent, because as we said, we are not interested in the money, it's the principle of the constitutionality of secret police operations.

The parties ultimately agreed to submit the case to the court on stipulated facts and not to appeal the disposition. Plaintiffs agreed to accept as complete relief $10,000 for any prevailing individual and $20,625 for any prevailing organization. The district judge then held that Rayner and Hogan had not established the sort of "chilling effect" that, under *Laird v. Tatum*, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972), is an essential ingredient of a justiciable controversy about surveillance. *Alliance to End Repression v. City of Chicago*, 627 F.Supp. 1044, 1052–53 (N.D. Ill.1985). The other three plaintiffs, the court concluded, had justiciable claims and were entitled to judgment on the merits. *Id.* at 1050–56. The court awarded $10,000 to Montgomery and $20,625 to each organization. The parties kept their bargain; no one appealed. The plaintiffs' lawyer then asked for attorneys' fees under 42 U.S.C. § 1988, and the district judge awarded him about $129,000. The City has appealed that award to the extent it reflects time spent after the parties agreed on the money damages.

Only "prevailing" parties are entitled to fees under § 1988, and the two sides disagree about what it means to prevail. The City observes that by insisting on a judicial decision, two plaintiffs gave up a sure $10,000 while the others obtained only what they would have had without a trial. The marginal value of the decision to the plaintiffs was a negative $20,000. Why, the City asks, should it be required to pay for

the many hours the plaintiffs' counsel spent to reduce the plaintiffs' recovery? It relies on *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *Spanish Action Committee v. City of Chicago*, 811 F.2d 1129 (7th Cir.1987); *Lenard v. Argento*, 808 F.2d 1242 (7th Cir.1987); *Palmer v. City of Chicago*, 806 F.2d 1316 (7th Cir.1986); and other cases saying that courts may not award fees for aspects of the case on which the plaintiffs lost (or achieved no material victory). The plaintiffs reply that they *won* the case. The City said it was not liable; the judge disagreed; and the marginal cost of litigating on behalf of the two losing plaintiffs was negligible.

More, the plaintiffs say, they won the only thing that mattered to them: the precedent. The precedential aspect of a decision may be valuable, and the award of fees may reflect the benefits judicial decisions provide for other people. E.g., *City of Riverside v. Rivera*, —— U.S. ——, 106 S.Ct. 2686, 2694–95, 91 L.Ed.2d 466 (1986) (plurality opinion), *id.* 106 S.Ct. at 2700 (Powell, J., concurring); *Lenard*, 808 F.2d at 1248; *Kirchoff v. Flynn*, 786 F.2d 320, 327 (7th Cir.1986). The City rejoins that this precedent was worthless because the injunction issued in 1981 gave the plaintiffs and others similarly situated all they could hope for. See our en banc opinion, 742 F.2d at 1015–16. *Spanish Action Committee*, 811 F.2d at 1136, relied on the injunction to conclude that a similar suit could not "generate any 'external benefits' in civil rights enforcement, beyond the damages awarded, for which the plaintiff should be compensated." But the district court distinguished *Spanish Action Committee* on the ground that the legal issue here was unsettled and that the court's opinion therefore may benefit people not covered by the injunction—for example, residents of other cities faced with similar surveillance. The plaintiffs add that the precedent will prevent public officials from invoking qualified immunity defenses in future cases, which will either induce compliance with the constitutional rules or smooth the path of future plaintiffs.

■ We have some doubts about the value of this precedent. The parties agreed not to appeal, which ensured that the decision would not become authoritative within the Seventh Circuit. (A decision is authoritative when it is binding because of the hierarchy among courts, rather than solely because it is persuasive.) A decision of a district judge has persuasive rather than authoritative effect, see *Colby v. J.C. Penney Co.*, 811 F.2d 1119, 1123–24 (7th Cir. 1987). That effect is diminished when appeal is impossible; a constraint on a judge's decision has been removed. Unappealable decisions often lack preclusive effects between the parties, see *Restatement (Second) of Judgments* § 28(1) and comment a (1982), because the absence of a threat of review makes them less reliable. The value of an unreviewable opinion depends on the persuasiveness of its reasoning rather than on the authority of its author as a judge. This means that the opinion would not overcome an immunity defense, for public officials are entitled to immunity until it has been authoritatively decided that certain conduct is forbidden. Even after an authoritative decision, "[u]ntil the constitutional right has been stated so that reasonably competent officers would agree on its application to a given set of facts, it has not been 'clearly established'." *Chapman v. Pickett*, 801 F.2d 912, 923 (7th Cir.1986) (dissenting opinion), adopted in *Colaizzi v. Walker*, 812 F.2d 304, 308 (7th Cir.1987). See also *Malley v. Briggs*, 475 U.S. 335, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986); *BeVier v. Hucal*, 806 F.2d 123, 128 (7th Cir.1986); *Benson v. Allphin*, 786 F.2d 268, 275–76 (7th Cir.1986).

■ Whether the slight precedential effect of an unreviewable decision is the sort of victory for which fees may be awarded is a nice question, but not one we shall decide. There is a more fundamental problem: the absence of a "case or controversy" within the meaning of Article III. This case was settled before the judge decided it. The defendants accepted an injunction against the conduct; the parties agreed on the monetary remedy too. There followed a wager of law: the plaintiffs staked $10,-

000 (or $20,625) apiece that they were right. Two lost all; three won and got both the money and the precedent. The parties' sole dispute concerned the contents of the court's opinion. That is not a justiciable controversy. It is a request for an advisory opinion—one that cannot help the plaintiffs and has effects, if at all, on strangers to the litigation.

The parties proceed as if the legal views of the district court were the "stakes" of the litigation. The plaintiffs want to acquire an opinion containing certain views; the defendants want to avoid the expression of these views. If this kind of "controversy" were enough to keep a case alive, then an advisory opinion would be its own justification—the fact that the parties cared enough to fight would show that they had a real controversy. Whatever the merits of this as an original interpretation of Article III, it is not the Supreme Court's view and never has been. E.g., *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982); *Haitian Refugee Center v. Gracey*, 809 F.2d 794 (D.C.Cir.1987) (three opinions exploring every corner of the case-or-controversy requirement). The expression of judicial views is a *byproduct* of the need to decide the case. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803). A discussion of constitutional law is a means to resolve a real dispute between the parties, to be avoided unless essential to that end. No matter how desirable it may be to have a constitutional question settled, the resolution must await the concrete controversy, for only then does the judge have an adequate justification for giving an opinion. Understanding that the constitutional decision is a byproduct of a need to develop all of the premises used to resolve a concrete controversy, rather than the *raison d'etre* of the judicial system, leads to the conclusion that the parties should not have asked the judge to decide this case, and she should not have acquiesced.

Our case is much like *Ashcroft v. Mattis*, 431 U.S. 171, 97 S.Ct. 1739, 52 L.Ed.2d 219 (1977). The police killed a fleeing suspect, whose heirs argued that the use of deadly force violated the fourth amendment. Because of the officers' qualified immunity the plaintiffs were not entitled to damages, and obviously they were not entitled to an injunction; there was no risk of the deceased being shot again. Nonetheless the court of appeals, seeking to resolve a recurrent question of constitutional law, declared that the use of deadly force is unconstitutional. The Supreme Court thought the opinion advisory, because no relief turned on the court's answer to the question. We have the same situation except for the stipulated damages: $10,000 (or $20,625) formally changed hands as a result of the answer to the question. But because the plaintiffs were entitled to those sums whether or not a court answered the question, the cases are fundamentally the same—unless the wager of law preserves the justiciable controversy.

The Supreme Court has never dealt with a pure wager of law. It has held that the existence of monetary stakes is not enough to keep a suit alive, if the underlying question has been settled or does not concern the litigants. *Diamond v. Charles*, 476 U.S. 54, 106 S.Ct. 1697, 1707–08, 90 L.Ed.2d 48 (1986). So a "pure" wager, in which A bets B $100 that a court will say a particular thing about C's rights vis à vis D, is not justiciable. Monetary stakes are not enough, if the issue in the case involves strangers. The "redressability" rule—the principle that a case is justiciable only when a constitutional adjudication is capable of solving the plaintiff's problems, see *Allen v. Wright*, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)—supports the same conclusion. Under this approach, a suit in which the parties dispute about the creation of a precedent *simpliciter*, where the plaintiff wants to bestow the precedent on other people, is not justiciable even if the plaintiff is willing to forfeit a stake in order to show his *bona fides*. Yet that describes our case. The plaintiffs, satisfied with the relief they had been offered, elected to forfeit that relief to obtain a chance on a precedent that would help only strangers.

Two cases might offer plaintiffs some support. In *Nixon v. Fitzgerald,* 457 U.S. 731, 743–44, 102 S.Ct. 2690, 2697–98, 73 L.Ed.2d 349 (1982), and *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 370–71, 102 S.Ct. 1114, 1119–20, 71 L.Ed.2d 214 (1982), the parties settled part of their dispute on terms that looked like wagers of law. For example, Nixon paid Fitzgerald $142,000, in exchange for which Fitzgerald agreed to accept another $28,000 as full damages if the Supreme Court should reject Nixon's argument that former Presidents have absolute immunity from civil liability for acts committed in the course of their duties. The Court held that this partial settlement did not deprive the Court of its power under Article III to resolve the case. The parties had a concrete dispute that would have been justiciable in the absence of the agreement; the resolution of the legal question (was Nixon absolutely immune?) would control the disposition of $28,000; that the parties had fixed their own damages and agreed not to contest any further issues (such as Nixon's substantive liability) did not distinguish the case from many others in which the parties focused on a single, dispositive issue of law and resolved other parts of the dispute amicably. In *Nixon* Fitzgerald could have had his $28,000 only by prevailing on the point of law. Our plaintiffs could have their $10,000 (or $20,625) whether or not they prevailed. By folding up his cards and leaving the table, Fitzgerald would have lost $28,000; by folding their hands plaintiffs Hogan and Rayner would have locked up $10,000 apiece; the other plaintiffs staked their offers against a precedent and nothing but. The difference between a plaintiff who must win on the law to prevail under the settlement (as in *Nixon* ) and a plaintiff who can prevail under the settlement by not litigating (our five plaintiffs) is the difference between a concrete dispute and an abstract one. Fitzgerald was in it for the money and the principle; our plaintiffs were in it for the principle alone.

There is yet another way in which this litigation may have been live. The injunction entered in 1981 was a consent decree rather than the result of contested litigation. We have hinted that governments may be able to withdraw from consent decrees entered without authority. See *Kasper v. Board of Election Commissioners,* 814 F.2d 332, 340–42 (7th Cir.1987); *Dunn v. Carey,* 808 F.2d 555, 559–60 (7th Cir.1986). Agents of the government have limited powers—limited temporally as well as substantively. Incumbents may be tempted to consent to relief that settles political rather than constitutional questions, thereby enhancing their authority at the expense of their successors (and the people who vote for their successors). The parties have not briefed the question whether the agents of the City of Chicago who gave consent in 1981 had authority to bind the City if it should turn out that the decree is more restrictive than the Constitution. It is at least possible that our five plaintiffs wanted a *judicial* decree to ensure against the possibility that the City would change its mind.

■ As it turns out, however, the plaintiffs did not ask for an injunction. They were satisfied with damages. So the case did not increase the longevity of the 1981 injunction or insulate it from a change of mind by a subsequent city administration. Moreover, the 1981 decree suspends the controversy for the time being. Voluntary discontinuation of a practice usually does not make a case moot, but it will end the "case or controversy" when recurrence of the dispute among these parties is very unlikely. See *Iron Arrow Honor Society v. Heckler,* 464 U.S. 67, 104 S.Ct. 373, 78 L.Ed.2d 58 (1983); *Murphy v. Hunt,* 455 U.S. 478, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982); *County of Los Angeles v. Davis,* 440 U.S. 625, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979); *United States v. 203 Paper Bags,* 818 F.2d 569 (7th Cir.1987). We do not detect any significant possibility that the City will again pry into the affairs of these plaintiffs without reasonable suspicion of criminal activity; to do so, the City would have to renounce its obligations under the consent decree, leading to proceedings that would offer the parties ample opportunity to discuss their different interpretations of the

first amendment. So as we concluded in *Spanish Action Committee*, the 1981 decree eliminates both need and justification for judicial resolution of constitutional questions affecting prospective relief against infiltrations by the City.

■ Our conclusion that this case is not justiciable answers a question raised in *Deposit Guaranty National Bank v. Roper*, 445 U.S. 326, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980): whether a plaintiff who is offered all the relief he demands may refuse the offer and go to trial. The answer is no. *Roper* observed that a "party who receives all that he has sought generally is not aggrieved by the judgment affording that relief and cannot appeal from it" (445 U.S. at 333, 100 S.Ct. at 1171) and suggested that the same principle probably would apply to a plaintiff offered all he wanted before trial. The Court held that rule (if it is one) not controlling in *Roper,* because the plaintiff was a class representative, and in that capacity he might be entitled to different treatment (including the award of attorneys' fees) than he would receive as a single claimant. The Court was influenced by the concern that a class action filed on behalf of five million people with $2 claims apiece not be demolished the day before trial by the tender of a $2 bill to the sole representative plaintiff. Appellate courts generally have treated *Roper* as establishing that a party must have an economic dispute with the defendant, one surviving the offer of settlement, to be allowed to press on in the face of the defendant's willingness to satisfy the plaintiff's initial demand. *Klein v. Wolf,* 702 F.2d 400, 404 (2d Cir.1983); *Zeidman v. J. Ray McDermott & Co.,* 651 F.2d 1030, 1042–43 & n. 10 (5th Cir.1981). Cf. *Balcom v. Lynn Ladder & Scaffolding Co.,* 806 F.2d 1127 (1st Cir.1986); *Miller v. Staats,* 706 F.2d 336, 341 (D.C.Cir.1983). Defendants, like the courts, have an interest in peace; once there is no more dispute, there is no case. Both the parties and the court may save the costs of litigation.

In our case only the desire of these five plaintiffs to obtain an advisory opinion led them to decline the City's offer of settle-ment. The plaintiffs pressed on to a trial that they could lose but not win. They got an opinion useless to themselves. Section 1988 does not contemplate that a party may "prevail" by obtaining an advisory opinion. The party must get relief useful to himself. Three of our plaintiffs obtained such relief, but they had obtained it as of the date they agreed to liquidate the damages. The attorney's time after that date, devoted to the pursuit of judicial advice (at the expense of two plaintiffs), is not compensable.

We should not be understood as holding that an award of attorneys' fees may not take into account the value of a precedent. The precedent may be valuable beyond price, and the award can recognize this. We hold only that the precedent, valuable though it is, must be a byproduct of the resolution of a real controversy. A party does not "prevail" by obtaining a precedent divorced from any other results.

The award of fees is vacated, and the case is remanded so that the judge may award to counsel the fees appropriate for work done before the parties agreed on the liquidated damages.