**UNITED STATES of America, Plaintiff–Appellant,**

v.

**Everett D. SEACOTT, Defendant–Appellee.**

No. 91–3724.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 4, 1992.

Decided Feb. 7, 1994.

---

Andrew B. Baker, Jr., Asst. U.S. Atty., Dyer, IN, Robert N. Trgovich (argued), Fort Wayne, IN, for plaintiff-appellant.

Stanley L. Campbell (argued), Swanson & Campbell, Fort Wayne, IN, for defendant-appellee.

Before ENGEL,* COFFEY and EASTERBROOK, Circuit Judges.

COFFEY, Circuit Judge.

Everett D. Seacott pled guilty to one count of willfully misapplying bank funds in violation of 18 U.S.C. § 657. Pursuant to the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"), the district court ruled that the sentencing range applicable to Seacott was 15–21 months of imprisonment. The district court then departed downward from the Guidelines range and sentenced the defendant to four months in a work release center and four months of home detention. The Government appeals the sentence, arguing that the district court erred in departing from the Guidelines range. 18 U.S.C. § 3742(b). We vacate Seacott's sentence and remand for resentencing.

## I.

### A. Criminal Conduct

Seacott was the Lampco branch manager/loan officer in Gas City, Indiana, from January 6, 1988 to February 1, 1989. One of the Lampco loans under Seacott's supervision was made to Newton Nichols, the owner of the Glass Bar tavern in Gas City, Indiana. The loan was for roughly $170,000. Since 1986, the Glass Bar had been battered by an economic decline in the Gas City area. Seacott advised Nichols to sell the tavern. Nichols listed the Glass Bar for sale, but needed operating capital while he searched for a buyer. Seacott could not authorize loans directly to Nichols sufficient to keep the Glass Bar operating. The defendant got around this problem by (1) loaning Nichols between $4,000–$5,000 of his own money and (2) by approving Lampco loans to persons he knew would funnel the money to Nichols and the Glass Bar. The first method was charity; the second was a violation of federal law. Seacott approved nine illegal loans totalling $78,572.62 to five individuals connected to Nichols and the Glass Bar. The documentation for those transactions falsely stated that the loan amount was to be used to purchase real estate, pay for home improvements, and purchase automobiles. The loan documents also claimed that the loans were secured by the assets they were being used to purchase. The loaned money was not used for the purposes stated in the loan documentation. Instead, the money was used as operating capital for the Glass Bar, to pay off loans the named borrowers had initially obtained to provide funds for the Glass Bar, and to reimburse to Seacott roughly $1,400 of the amount he had personally lent to Nichols and the Glass Bar.

---

* The Honorable Albert J. Engel, of the Sixth Circuit Court of Appeals, is sitting by designation.

## B. District Court Proceedings

Seacott pled guilty to one count of violating 18 U.S.C. § 657 in connection with the misapplication of the Lampco funds. The Probation Department, using the 1990 version of the Guidelines, arrived at Seacott's adjusted offense level by starting with a base offense level of four, U.S.S.G. § 2B1.1(a); adding eight levels because the loss to the victim (Lampco) was between $70,000 and $120,000, U.S.S.G. § 2B1.1(b)(1)(I); adding two levels because the offense involved more than minimal planning, U.S.S.G. § 2B1.1(b)(5); adding two levels because the defendant abused a position of public trust, U.S.S.G. § 3B1.3; and subtracting two levels because the defendant accepted responsibility for his crime, U.S.S.G. § 3E1.1. The defendant's adjusted offense level was thus 14, and with a criminal history category of I, the Guidelines dictated imprisonment for 15–21 months. The Probation Department advised the district court that a departure from the Guidelines range was not warranted.

At the sentencing hearing, the district court accepted the Probation Department's calculation of the defendant's adjusted base offense level and agreed that the applicable Guidelines range was 15–21 months imprisonment. The district court, however, ruled that a downward departure from the Guidelines range was appropriate in Seacott's case for two reasons. First, Seacott was not motivated by "self gain" in misapplying Lampco's money, but rather by a desire that one of Lampco's business debtors, the Glass Bar, not default on its loan. In support of this ruling, the court found that Seacott "did not benefit personally by any of these transactions ... and that everything he did with respect to these loans were done to preserve his customer/employer status and to keep the loan afloat so that if economic conditions recovered ... that his employer, in fact, would make good on these loans." The court's second reason for departing downward was its view that "the primary objective

in the sentencing in this case .... is to try to provide for the restitution to the victim ..." so that the sentence will be the "most beneficial to the victim, the defendant and the taxpayers." The court then announced that Seacott would serve four months in the custody of the Bureaus of Prisons in a work release center and "be allowed to leave the facility for work purposes only. Four months shall be spent under home detention as a condition of supervised release." The court also ordered the defendant to pay restitution for the net loss suffered by Lampco. After the court sentenced Seacott, the Government prosecutor asked the court whether it had "announce[d] what the [Guidelines] offense level was subsequent to your downward departure." The court responded, "if the Probation Department can tell me what quantum of departure I need to show to reflect this sentence, I'll do it. The sentence is the sentence." After a colloquy among the prosecutor, defense attorney, and probation officer, the court determined that it would depart downward four levels to level 10 in order to reach the sentence it had previously imposed.

## II. Analysis

### A. The Applicable Guidelines

■ The first question we address is which version of the Guidelines is applicable to the defendant. This issue was not raised by either party, but given its potential importance to the defendant we requested supplemental briefing from both parties.[1] When an issue is not raised by a party, our review is limited to plain error. "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Fed.R.Crim.P. 52(b); *United States v. Kopshever*, 6 F.3d 1218, 1222 (7th Cir.1993) (although ex post facto problem not raised at sentencing, "the gravity of the constitutional concerns" warranted addressing the issue for the first time on

---

1. In an order dated October 18, 1993, we directed the parties to submit supplemental briefing on whether application of the 1990 Sentencing Guidelines created an ex post facto problem and if it did, whether it was plain error. The government conceded there was an ex post facto violation but maintained it did not rise to the level of plain error because it was not significantly prejudicial. The defendant, however, argued that the ex post facto violation constituted plain error because the error was certain and readily correctable.

appeal); *United States v. Belanger*, 936 F.2d 916, 920 (7th Cir.1991) (remand compelled after court discovered *sua sponte* a sentencing error); *cf. United States v. Wilson*, 962 F.2d 621, 627–28 (7th Cir.1992) (vacating defendant's sentence on the basis of *ex post facto* violation raised for the first time in a reply brief).

■ Contrary to the contention of the concurrence that we have taken a "detour" by "roving" through the record in search of error, we are merely exercising judicial discretion to rectify a constitutional harm that all other circuits have previously recognized and acted upon to correct. In the instant case the harm is not only to the defendant, Seacott, but to the criminal justice system as a whole, i.e., by preventing the prospect of future defendants serving extra prison time (reducing overcrowding in our prison system) as well as by curbing needless future litigation on this issue. The concurrence further maintains that because the statute (18 U.S.C. § 3553(a)(4)) "is not screechingly unconstitutional" we should refrain from passing judgment on it. While we have been unable to discover any legal precedent for the newly created "screechingly unconstitutional" doctrine, we do know that after receiving supplemental briefing on the subject from both parties (in response to the concurring judge's request that we not address the ex post facto problem without further briefing from the parties), we can confidently say that retroactive application of a harsher sentencing guideline contravenes the very purpose of the Ex Post Facto Clause. Finally, the concurrence expresses concern that the ex post facto issue does not "matter[ ] to the judgment." We fail to understand this argument for we are unaware of anyone who would maintain that even one additional hour of confinement, much less a day or week of confinement, "does not matter."

As a general rule, a district court must sentence a defendant based on the Guidelines in effect on the date of sentencing. 18 U.S.C. § 3553(a)(4). However, as we recently noted, "every circuit except our own has held that the Ex Post Facto Clause of the Constitution prohibits application of a guidelines provision not in effect on the date of the

offense if the new provision operates to the detriment of the defendant." *United States v. Harris*, 994 F.2d 412, 416 n. 9 (7th Cir. 1993). *United States v. Schnell*, 982 F.2d 216, 218 (7th Cir.1992), lists representative cases so holding from each of the other eleven circuits. Many of our cases have stated this proposition in dicta. *See, e.g., United States v. Willey*, 985 F.2d 1342, 1350 (7th Cir.1993); *United States v. Foutris*, 966 F.2d 1158, 1160 (7th Cir.1992); *United States v. Golden*, 954 F.2d 1413, 1417 (7th Cir.1992). *Compare United States v. Wilson*, 962 F.2d 621, 627–28 (7th Cir.1992) (invalidating on ex post facto grounds the retroactive application of a criminal statute amended to the detriment of the defendant after the commission of the offense).

This court addressed the ex post facto question most recently in *United States v. Kopshever*, in which we stated "[e]xcept for a suggestion by way of dictum in one of our opinions [*United States v. Bader*, 956 F.2d 708, 709 (7th Cir.1992) ], it has been universally held that when the Sentencing Commission amends the Guidelines to increase the severity of a punishment, the Ex Post Facto Clause prohibits application of the amended Guidelines to crimes performed before the amendment's effective date . . . ." *Kopshever*, 6 F.3d at 1222. Rather than resolving the ex post facto problem, *Kopshever*, remanded the issue to the district court because the record was undeveloped, the government had conceded there was a violation and the issue may have been moot. *Id.* at 1222–23 & n. 6.

As mentioned in *Kopshever*, one of our cases has suggested in dicta that retroactive application of guidelines amendments which disadvantage the defendant does not violate the Ex Post Facto Clause. *United States v. Bader*, 956 F.2d 708, 709 (7th Cir.1992). The *Bader* dicta conceded that *Miller v. Florida*, 482 U.S. 423, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987) "shows that sentencing guidelines may be 'laws' for purposes of the ex post facto clause" but argued that "it remains to determine how the laws have changed, and whether the particular change exceeds the constitutional constraint." *Bader*, 956 F.2d at 709. *Bader* then argued that

"[a]lthough the guidelines influence the exercise of discretion within the statutory range, judges may depart at appropriate times. On this understanding, a change in the sentencing guidelines is no different from, say, the institution of a get-tough policy under which the prosecutor no longer accepts guilty pleas ·to lesser offenses, or the appointment of a new judge who favors longer sentences, or a change in the guidelines for parole, *see Prater v. U.S. Parole Commission*, 802 F.2d 948 (7th Cir. 1986) (in banc), or a decision by the President to cease commuting the sentences of a class of felons. All of these may increase the time a criminal spends in prison without transgressing the ban on ex post facto laws."

*Id.* at 709. As pointed out in the *Bader* dicta, in *Prater* we held that parole guidelines are not laws subject to the ex post facto clause, but that holding rested on a conclusion that the parole guidelines served an "interpretive rather than legislative" function. *Prater*, 802 F.2d at 954. The parole guidelines, we explained, "are not the exercise of delegated authority (e.g., to make rules of procedure); they are statements of enforcement policy. They are ... 'merely guides, and not laws: guides may be discarded where circumstances require; laws may not.'" *Id.* (citation omitted). Under the parole guidelines, "the granting of parole" remained in the exclusive "discretion of the [Parole Commission]." *Id.* (citation omitted). *Bader*'s analogy between the parole guidelines (and the other examples it gives of changes which can effect a defendant's sentence) and the sentencing guidelines is unpersuasive because the sentencing guidelines tightly control the discretion of sentencing courts. As the Eighth Circuit recently explained in *United States v. Bell*, 991 F.2d 1445 (8th Cir.1993):

"Sentencing courts must impose sentences consistent with the [United States Sentencing] Guidelines; they are not merely a factor to be considered by the sentencing court.... In this sense, the Guidelines represent (in a typical case) additional minimums and maximums that are superimposed over the minimums and maximums statutorily enacted by Congress; a court is required to impose a sentence that is both between the applicable statutory minimum/maximum and within the Guideline-generated minimum/maximum.

"In a truly atypical case, a district court is permitted to depart from the guidelines.... Although a court has discretion to grant or deny a departure once a sufficiently unusual circumstance is present, ... appellate courts scrutinize such decisions to insure that the factors relied on are truly of a kind or degree not already considered or rejected by the [Sentencing] Commission.... Thus the district court has no ability to exercise discretion because its power is firmly controlled by the Commission. We conclude that [18 U.S.C. § 3353(b) (authorizing departures)] does not give district courts the degree of discretion to ignore the guidelines sufficient to prevent the obvious conclusion that the guidelines dictate defendants' sentences."

*Bell*, 991 F.2d at 1450.

■ Applying the ex post facto clause to Sentencing Guideline amendments is consistent with the Supreme Court's opinion in *Miller v. Florida*, 482 U.S. 423, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987), in which it considered the ex post facto clause in connection with Florida's sentencing guidelines. At the time the petitioner in *Miller* committed the crime for which he was convicted, Florida's sentencing guidelines would have resulted in a presumptive sentence of 3½ to 4½ years' imprisonment, but at the time he was sentenced the revised guidelines called for a presumptive sentence of 5½ to 7 years in prison. *Id.* at 424, 107 S.Ct. at 2448. The Florida trial court applied the guidelines in effect at the time of sentencing and imposed a 7–year sentence. *Id.* The Supreme Court held that the petitioner's sentence was in violation of the ex post facto clause. *Id.* at 435–36, 107 S.Ct. at 2453–54. The Court explained that "to fall within the ex post facto prohibition, two critical elements must be present: first, the law 'must be retrospective, that is, it must apply to events occurring before its enactment'; and second, 'it must disadvantage the offender affected by it.'" *Id.* at 430, 107 S.Ct. at 2451 (citation omitted). The Court held that the amended

guidelines increasing the petitioner's sentence contained both critical elements since ex post facto concerns are implicated by "[e]very law that changes the punishment, inflicts a greater punishment, than the law annexed to the crime, when committed." *Miller*, 482 U.S. at 429, 107 S.Ct. at 2450 (quoting *Calder v. Bull*, 3 Dall. 386, 390, 1 L.Ed. 648 (1798)). The reasoning of *Miller* is directly applicable to the federal sentencing guidelines, which are substantially similar to Florida's. We thus join all of our sister circuits in holding that a guideline amendment which occurs after the commission of the defendant's crime which works to the defendant's detriment is inapplicable because it is a violation of the Ex Post Facto Clause.

■ The only remaining question is whether the trial court's application of the 1990 Guidelines was plain error. In light of *Miller*, 482 U.S. 423, 107 S.Ct. 2446; *Kopshever*, 6 F.3d 1218; *Willey*, 985 F.2d 1342 and *Wilson*, 962 F.2d 621, as well as the fact that each of the other circuits has determined that retroactive application of amended guidelines resulting in stiffer sentences violates the Ex Post Facto Clause, we are of the opinion that it was plain error for the sentencing court to apply the 1990 Guidelines rather than the 1988 version. The prejudice to the defendant is clear as the 1990 Guidelines resulted in a sentence that was potentially three months longer than under the 1988 Guidelines. *See United States v. Olano*, — U.S. —, — — —, 113 S.Ct. 1770, 1777–78, 123 L.Ed.2d 508 (1993) ("plain error" must be "clear" and "prejudicial").

In this case, the district court applied the Guidelines in effect when the defendant was sentenced in October, 1991. As we stated above, under that version of the Guidelines the defendant's base offense level was increased eight levels because the loss involved was $78,572. U.S.S.G. § 2B1.1(b)(1)(I) (1990). However, the Guidelines in effect when Seacott committed his crime in 1988 and early 1989 provided that an offense involving a loss of between $50,001 and $100,-000 triggered a seven level increase in the base offense level. U.S.S.G. § 2B1.1(b)(1)(H) (1988). The amendment increasing to eight the offense level adjustment applicable to a crime involving a loss of $78,572 became effective on November 1, 1989, after Seacott committed his crime but before his sentence was imposed. U.S.S.G., App. C at C.51–52 (1989). Under the 1990 Guidelines Seacott's adjusted offense level is one level higher than under the 1988 Guidelines (fourteen rather than thirteen). Therefore, the 1988 Guidelines, those in effect when Seacott committed his crime, are applicable to him. With an offense level of thirteen and a criminal history category of I, the Guidelines sentencing range applicable to Seacott is 12–18 months, not 15–21 months.

### B. The Downward Departure

[5] District courts must impose sentences within the applicable Guidelines range unless the court "finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by ... the guidelines that should result in a sentence different from that described." 18 U.S.C. § 3553(b); *see also* U.S.S.G. § 5K2.0, p.s.; *United States v. Frazier*, 979 F.2d 1227, 1229 (7th Cir.1992). This court applies a three-step approach in reviewing a sentencing court's departure from the applicable Guidelines range: (1) we review *de novo* whether a district court's stated grounds for departure may be relied upon to justify the departure; (2) we review for clear error whether the facts that support the grounds for departure actually exist in the case; and (3) we review deferentially whether the degree of departure is appropriate. *Willey*, 985 F.2d at 1349; *United States v. Boula*, 932 F.2d 651, 655 (7th Cir.1991).

### 1. The Motive Behind the Crime

■ We begin by reviewing *de novo* the district court's grounds for departing downward four levels from the applicable Guidelines range. The court cited, as a basis for its departure, its view that Seacott was not motivated by "self-gain" in misapplying Lampco's money, but rather by a desire to see one of Lampco's borrowers, the Glass Bar, remain financially viable. The district court reasoned that the framers of the Guidelines had not taken into account the possibility that a defendant would misapply funds in

violation of 18 U.S.C. § 657 for other than his own pecuniary interests, and that therefore the Guidelines overstated the punishment appropriate to Seacott. This is a legally insufficient reason to depart downward from the applicable Guidelines range.[2] The drafters of the Guidelines demonstrated numerous times that when they thought it appropriate to adjust a sentence based on whether the defendant acted with a profit motive, they explicitly directed courts to consider that factor. *See, e.g.,* U.S.S.G. § 2G1.1 (Transportation for the Purpose of Prostitution or Prohibited Sexual Conduct), comment. (n. 1) ("The base offense level assumes that the offense was committed for profit. In the infrequent case where the defendant did not commit the offense for profit and the offense did not involve physical force or coercion, the Commission recommends a downward departure of 8 levels."); U.S.S.G. § 2H3.1(b)(1) (Interception of Communications or Eavesdropping) ("If the purpose of the conduct was to obtain direct or indirect commercial advantage or economic gain not covered by U.S.S.G. § 2H3.1(a)(2) above, increase by 3 levels."); U.S.S.G. § 2H3.2(b)(1) (Manufacturing, Distributing, Advertising, or Possessing an Eavesdropping Device) ("If the offense was committed for pecuniary gain, increase by 3 levels"); *see also* U.S.S.G. § 2L1.1(b)(1); U.S.S.G. § 2L2.1(b)(1); U.S.S.G. § 2L2.3(b)(1). Given the frequency with which the drafters of the Guidelines specifically adjusted offense levels based on whether the defendant was motivated by profit, we must assume that had they been interested in providing for such an adjustment for § 2B1.1 crimes, they would have done so.

Seacott claims to find support in the commentary to § 2B1.1 for the district court's reliance on his lack of a profit motive as a grounds for departure. Specifically, he points to language in the commentary to § 2B1.1 which provides that the "value of property taken plays an important role in determining sentences for theft offenses, be-

cause it is an indicator of both the harm to the victim and the gain to the defendant," U.S.S.G. § 2B1.1, comment. (backg'd).[3] Seacott claims that this is evidence that the framers of the Guidelines assumed that in every § 2B1.1 crime there would be harm to the victim as well as gain to the defendant. Because the latter is lacking here, Seacott argues, the district court properly departed downward from the applicable sentencing range. We disagree. The language Seacott cites from the commentary demonstrates that in crafting § 2B1.1 the framers of the Guidelines considered, among other factors, harm to the victim *and* gain to the defendant. The formulation they believed best reflected these and other considerations was one based explicitly on "loss" ("value of the property taken, damaged or destroyed"): under § 2B1.1, the greater the loss, the longer the prison term. The district court's focus on the defendant's lack of a profit motive in this case was thus in direct contravention to the Guidelines' command to sentence based on loss.

It is not surprising that the Guidelines direct district courts to sentence defendants convicted of crimes like Seacott's based on the value of the property they take, rather than on their motive for taking it. Persons in positions of authority at financial institutions are entrusted with vast sums of other people's money. It makes little difference to their victims if these financial managers illegally transfer funds to themselves, to third parties, or if they pile up the money in the parking lot and burn it. The same amount of money has been taken from the victim no matter what the fate of the funds. The aim of the criminal law in this area is to deter misapplication of funds *for any reason*. The language of Section 2B1.1 recognizes this reality by making the length of the defendant's prison term a variable based on the amount of property he takes.

---

**2.** As we make clear below, we believe the district court committed clear error when it found that Seacott committed his crime without any concern for his own economic self-interest. However, for purposes of determining the legal sufficiency of basing a departure on the alleged selflessness of Seacott's motives, we will assume that

he misapplied the funds purely to aid the Glass Bar.

**3.** The commentary defines "loss" as "the value of the property taken, damaged, or destroyed." U.S.S.G. § 2B1.1, comment. (n. 2).

[7] Moreover, as we stated in footnote two, even if we agreed with the district court that the defendant's motive in misapplying the funds merits a downward departure, we would still reverse the defendant's sentence because the district court committed clear error in finding that Seacott acted *entirely* without any motive of self-gain. In order to offset some of the losses he incurred when he loaned his own money to Nichols and the Glass Bar, Seacott diverted to himself roughly $1,400 of the Lampco funds he fraudulently approved as loans. At least in this transaction, Seacott was misapplying Lampco's money not just to aid the Glass Bar, but to limit his own losses from the personal loans he had improvidently made. Moreover, Seacott may have been attempting to keep the Glass Bar afloat in order to avoid the delinquency of one of the loans he was supervising, thus protecting his reputation at Lampco. Seacott's own pecuniary interest thus did in fact play a part in his commission of his crime.

### 2. Restitution to the Victim

■ The second reason the district court gave for departing downward from the Guidelines sentencing range was to implement what the court termed its "primary [sentencing] objective" of ensuring that Seacott could make restitution to Lampco. Under 18 U.S.C. § 3553(a)(7), sentencing courts are directed to consider "the need to provide restitution to any victims of the offense." We have held that this provision is a factor that the district court may consider in sentencing the defendant *within the Guidelines range. United States v. Franz,* 886 F.2d 973, 979 n. 7 (7th Cir.1989); *United States v. Barber,* 881 F.2d 345, 351 n. 3 (7th Cir.1989), *cert. denied,* 495 U.S. 922, 110 S.Ct. 1956, 109 L.Ed.2d 318 (1990); *see also United States v. Bolden,* 889 F.2d 1336, 1341 (4th Cir.1989). The question here is whether restitution is a proper ground to be considered to justify departing downward from the Guidelines range. We review this ground for departure *de novo. Willey,* 985 F.2d at 1349. In *United States v. Carey,* 895 F.2d 318, 323 (7th Cir.1990), we held that a sentencing court could not base a downward departure on the fact that a defendant made restitution to his

victim prior to the adjudication of his guilt. We based our conclusion on the fact that restitution was explicitly considered by the Guidelines as a factor in determining whether a defendant was entitled to a two-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1 comment. (n. 1(b)). *Id.* The Commentary to § 3E1.1 "demonstrates that the Commission adequately considered restitution as a mitigating circumstance when formulating the Guidelines," *id.* at 323, and therefore it is not an appropriate ground for departure. *See* 18 U.S.C. § 3553(b) (departures are permissible only when "there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by ... the guidelines").

■ In the instant case, unlike *Carey,* the district court did not reward Seacott for making restitution to Lampco prior to his adjudication of guilt. Instead, the court reduced Seacott's sentence in order to give him "the opportunity to make full restitution" to Lampco and minimize "the cost to the taxpayers." But if, under *Carey,* a district court cannot depart downward as a reward for restitution made to the victim, it would make little sense to hold that district courts may depart downward based on the promise of *future* restitution. Moreover, as the Sixth Circuit has reasoned, "it seems that the Sentencing Commission considered including the ability to make restitution as a possible mitigating circumstance, yet rejected it as a basis for departure from the guidelines" by explicitly stating that socio-economic status is not relevant in the determination of a sentence. *See* U.S.S.G. § 5H1.10, p.s. *United States v. Harpst,* 949 F.2d 860, 863 (6th Cir.1991). "[A] rule permitting greater leniency in sentencing in those cases in which restitution is at issue and is a meaningful possibility ... would, we believe, nurture the unfortunate practice of disparate sentencing based on socio-economic status, which the Guidelines were intended to supplant." *Id.* at 863. The framers of the Guidelines stated that

"[u]nder [pre-Guidelines] sentencing practice, courts sentence[d] to probation an inappropriately high percentage of offenders guilty of certain economic crimes, such as theft, tax evasion, antitrust offenses,

insider trading, fraud, and embezzlement, that in the Commission's view are 'serious'. If the guidelines were to permit courts to impose probation instead of prison in many or all such cases, the ... sentences would continue to be ineffective. The Commission's solution to this problem has been to write guidelines that classify as 'serious' (and therefore subject to mandatory prison sentences) many offenses for which probation is now frequently given."

U.S.S.G. Ch. 1. Pt. A.4(d), pp. 1.8–1.9. Allowing sentencing courts to depart downward based on a defendant's ability to make restitution would thwart the intent of the guidelines to punish financial crimes through terms of imprisonment by allowing those who could pay to escape prison. It would also create an unconstitutional system where the rich could in effect buy their way out of prison sentences. *See Bearden v. Georgia,* 461 U.S. 660, 672–73, 103 S.Ct. 2064, 2072–73, 76 L.Ed.2d 221 (1983) ("To ... deprive the probationer of his conditional freedom simply because, through no fault of his own, he cannot pay the fine ... would be contrary to the fundamental fairness required by the Fourteenth Amendment."); *Tate v. Short,* 401 U.S. 395, 91 S.Ct. 668, 28 L.Ed.2d 130 (1971) (violation of the equal protection clause to limit punishment to payment of a fine for those who are able to pay it but to convert the fine to imprisonment for those unable to pay). Thus, a defendant's ability to make restitution is not grounds for a downward departure under the Guidelines. *See also United States v. Bolden,* 889 F.2d 1336, 1340–41 (4th Cir.1989) ("[W]e do not think that the economic desirability of attempting to preserve [defendant's] job so as to enable him to make restitution warrants a downward adjustment from the guidelines").

### 3. Method of Departure

█ Even had the district court given reasons considered to be valid for departing downward from the Guidelines range, we would still vacate the defendant's sentence because of the manner in which the court arrived at Seacott's sentence. "Departures, whether upward or downward, must be linked to the structure of the guidelines." *United States v. Thomas,* 930 F.2d 526, 530 (7th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 171, 116 L.Ed.2d 134 (1991). In departing from the Guidelines, district courts must

"employ the rationale and methodology of the guidelines when considering cases not adequately addressed by existing guidelines. The sentencing judge is thus required to articulate the specific factors justifying the extent of his departure and to adjust the defendant's sentence by utilizing an incremental process that quantifies the impact of the factors considered by the court on the defendant's sentence."

*Id.* at 531. "Significant departures—those of more than two levels—must be explained with a care commensurate with their exceptional quality." *United States v. Muzika,* 986 F.2d 1050, 1054 (7th Cir.1993) (quoting *Thomas,* 930 F.2d at 531). In this case, the sentencing transcript reveals that the district court concluded that the defendant should not serve any time in prison, and then departed downward four levels to achieve that result. *Thomas* makes clear such a method of departing, completely untethered to the structure, rationale or methodology of the Guidelines, is impermissible. "The guidelines must be used as a reference when departing." *United States v. Eiselt,* 988 F.2d 677, 680 (7th Cir.1993).

### III. Conclusion

The record in this case makes clear that the district court was of the belief that defendants like Seacott should be punished not with prison terms, but by ordering them to earn money to pay restitution to the victims of their financial crimes. This may be a sensible approach, but it is not the law. Departures must "be based on policies found in the guidelines themselves rather than in the personal penal philosophy of the sentencing judge." *United States v. Newman,* 965 F.2d 206, 213 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 470, 121 L.Ed.2d 377 (1992). Because the downward departure in this case is inconsistent with the dictates of the Guidelines, we VACATE Seacott's sentence and REMAND to the district court for resentencing consistent with this opinion.

EASTERBROOK, Circuit Judge, concurring.

The district court imposed a sentence below the range prescribed by the Sentencing Guidelines, and the United States took an appeal. The only question presented is the propriety of departing for the reasons the court gave. Part II.B of the court's opinion shows that the district court's approach conflicts with the text and structure of the guidelines. I join that portion of the opinion and the judgment remanding the case for resentencing.

On the way to the questions the parties have debated, the majority takes a detour. Raising on its own initiative the question whether 18 U.S.C. § 3553(a)(4), which requires the court to use the guidelines in force at the time of sentencing, violates the ex post facto clause of the Constitution, the majority "holds" that it does. I do not join this exercise in obiter dicta, for the question was not raised in the district court or this one and is not pertinent to the disposition of the case.

Appellate judges do not possess roving discretion to deliver opinions on issues that lurk in the background of cases, but that the parties themselves do not present for decision. Ours is an adversarial system; judges write opinions to explain their resolution of concrete disputes, not to generate law in the abstract. *Hewitt v. Helms*, 482 U.S. 755, 761–63, 107 S.Ct. 2672, 2676–77, 96 L.Ed.2d 654 (1987); *Alliance to End Repression v. Chicago*, 820 F.2d 873, 876 (7th Cir.1987). In the main, we must be mum about questions the parties neglect to address.

In criminal cases the sole source of authority to decide non-jurisdictional issues that the parties have not preserved in the district court and raised in their appellate briefs is Fed.R.Crim.P. 52(b): "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Following the express command of a statute cannot be plain error. The reticence any court should bring to the task of constitutional adjudication—a diffidence captured by the maxim that statutes enjoy a strong presumption of constitutionality, *United States v. Watson*, 423 U.S. 411, 416, 96 S.Ct. 820, 824, 46 L.Ed.2d 598 (1976)—precludes an appeal to Rule 52(b). " 'Plain' [in Rule 52(b) ] is synonymous with 'clear' or, equivalently, 'obvious.' " *United States v. Olano*, —— U.S. ——, ——, 113 S.Ct. 1770, 1777, 123 L.Ed.2d 508 (1993). See *United States v. Caputo*, 978 F.2d 972, 975 (7th Cir.1992) (an error is "plain" only if gravely prejudicial and obvious in retrospect). Section 3553(a)(4) is not screechingly unconstitutional. A series of decisions in this circuit has expressed divergent views about the subject and postponed decision to a case in which the subject is fully briefed and controls the outcome, not the approach one would expect if the statute were some constitutional pariah. E.g., *United States v. Kopshever*, 6 F.3d 1218, 1221–23 (7th Cir.1993); *United States v. Schnell*, 982 F.2d 216, 218–19 (7th Cir.1992); *United States v. Bader*, 956 F.2d 708, 709 (7th Cir.1992). Indeed, the common thread of the many cases in this circuit noting the question is that it is *not* plain error to follow § 3553(a)(4). That is why other panels reserved decision. The one thing these cases can be said to *hold* is that this constitutional question should not be decided until it has been fully briefed and matters to the judgment.

Even obvious errors do not lead to automatic condemnation. Only an error that produces a miscarriage of justice supports an invocation of Rule 52(b). That means an error "seriously affect[ing] the fairness, integrity or public reputation of judicial proceedings." *United States v. Atkinson*, 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936), followed in *Olano*, —— U.S. at ——, 113 S.Ct. at 1779. For all the majority tells us, the choice between the 1988 and 1991 versions of the guidelines had no effect on Seacott's sentence, which may explain why the parties paid the subject no heed despite cases such as *Bader* and *Schnell* inviting attention to the status of § 3553(a)(4). Today the 1993 guidelines are in force; do these differ materially from the rules on the books when Seacott defrauded the credit union? Will that difference affect the sentence? (Small differences produce overlapping ranges, and the same sentence is possible under each version.)

*Olano* emphasizes that Rule 52(b) permits courts of appeals to disregard even plain and prejudicial errors. 113 S.Ct. at 1778–79. Thus even if the application of § 3553(a)(4) was both clearly inappropriate and prejudicial to Seacott, we must act prudently in deciding whether to address the question. Issuing an opinion on the constitutionality of an Act of Congress, when the parties have not given us an adversarial presentation on the issue, is not prudent. The United States Attorney filed a brief conceding that § 3553(a)(4) is unconstitutional, apparently believing that we have so held in *Kopshever*—a case that carefully reserved decision on the issue, 6 F.3d at 1222 n. 6. A concession based on a misreading of our precedents means that we have not had the benefit of an adversarial presentation. Decisions reached without the benefit of the parties' views are more likely to overlook important matters. (The majority does not mention the considerations I discuss below.) The prosecutor's concession may justify instructing the district court to use the 1988 version of the guidelines on remand; it does not justify a "holding" that the law violates the Constitution.

Instead of finding ways to express a constitutional verdict on § 3553(a)(4), we should be searching for ways to avoid decision. *Spector Motor Service, Inc. v. McLaughlin*, 323 U.S. 101, 105, 65 S.Ct. 152, 154, 89 L.Ed. 101 (1944); *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 501, 105 S.Ct. 2794, 2800, 86 L.Ed.2d 394 (1985). Constitutional adjudication is a last resort. Justice Brandeis's concurring opinion in *Ashwander v. TVA*, 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936), is but the most famous exposition of a principle that has existed since the founding of this Nation. Yet my colleagues do not contend that decision has been forced upon them; instead, they seek out a question that the parties themselves do not believe material to this case.

Because the majority has decided to tackle this subject, I express a few words of doubt about my colleagues' approach. Article I § 9 cl. 3 of the Constitution provides: "No Bill of Attainder or ex post facto Law shall be passed." The only statute the majority discusses is § 3553(a)(4), which assuredly is not

an ex post facto law. It was enacted in 1984, with an effective date of November 1, 1987; both dates are well before Seacott committed his crimes. What my colleagues must mean is that Sentencing Guidelines altered after the date of the offense are ex post facto laws. Yet Art. I § 9 cl. 3 applies to Congress, not to the judicial branch of government, in which the Sentencing Commission is located. *Mistretta v. United States*, 488 U.S. 361, 384–97, 109 S.Ct. 647, 661, 102 L.Ed.2d 714 (1989). "The Ex Post Facto Clause is a limitation upon the powers of the Legislature, see *Calder v. Bull*, 3 Dall. 386, 1 L.Ed. 648 (1798), and does not of its own force apply to the Judicial Branch of government." *Marks v. United States*, 430 U.S. 188, 191, 97 S.Ct. 990, 992, 51 L.Ed.2d 260 (1977). See also *Prater v. U.S. Parole Commission*, 802 F.2d 948, 951–52 (7th Cir.1986) (en banc). Guidelines are not "laws"; only Congress makes "laws"; the guidelines are administrative rules. *Mistretta*, 488 U.S. at 391–97, 109 S.Ct. at 664–68; see *Stinson v. United States*, —— U.S. ——, ——–——, 113 S.Ct. 1913, 1918–19, 123 L.Ed.2d 598 (1993). We emphasized their status as rules rather than laws when holding that a misapplication of the guidelines does not support relief under 28 U.S.C. § 2255. See *Scott v. United States*, 997 F.2d 340 (7th Cir.1993).

One may say that the guidelines have "the force of law," see *United States v. Bell*, 991 F.2d 1445, 1449–52 (8th Cir.1993), but this is a figure of speech. The constitutional status of federal rules does not depend on metaphors. To say that the guidelines have the "force of law" is to say that courts will enforce them, but this is also true of declarations in judicial opinions. The reference to "ex post facto Laws" appears in Article I and uses the meaning of "Law" in that Article, which establishes and regulates the legislative branch of government. A "Law" is a bill passed by both Houses of Congress and signed by the President, or enacted by two-thirds of each chamber without the President's approval. Thus in *Prater* the full bench concluded that the Parole Commission's release guidelines are not "Laws" for purposes of Art. I § 9 cl. 3, although they are authorized by statute, promulgated in the Federal Register, have the "force of law" in

the same sense as other regulations, and determine the length of time a felon spends in prison. See 802 F.2d at 952–53. *Prater* allowed that a complete delegation of legislative power might be subject to analysis under Art. I § 9 cl. 3, see 802 F.2d at 954, but Congress has not handed over to the Sentencing Commission the power to increase penalties for crime. Although it has authorized the Commission to permit sentences lower than mandatory minima, 18 U.S.C. § 3553(c), it has not authorized the Commission to increase maximum penalties. The Sentencing Reform Act creates only the power to guide judicial discretion within the statutory limits. Like the parole release guidelines, the Sentencing Guidelines are benchmarks: statements of the normal outcome that do not prohibit variation when circumstances show that the benchmark time in prison is inappropriate. See *United States v. Rivera*, 994 F.2d 942 (1st Cir.1993) (Breyer, J.).

The federal guidelines differ from the Florida sentencing guidelines addressed in *Miller v. Florida*, 482 U.S. 423, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987). Florida authorized its supreme court to adopt rules that would become effective "only upon the subsequent adoption by the Legislature of legislation implementing the guidelines as then revised." Fla.Stat. § 921.001(4)(b). This made the state's sentencing guidelines "laws" for constitutional purposes, the Court concluded. 482 U.S. at 435, 107 S.Ct. at 2453. We know from *Mistretta*, however, that the federal guidelines are judicial products, and from *Stinson* and *Scott* that they are rules rather than "laws."

When *Marks* said that the ex post facto clause does not apply "of its own force" to the executive and judicial branches, it was recognizing that a line of cases uses the due process clauses of the fifth and fourteenth amendments to limit the powers of these actors. Decisions inspired by the ex post facto jurisprudence hold that the executive branch may not promulgate surprising rules, or the judicial branch fashion surprising interpretations of existing rules, that deprive criminal defendants of fair notice. E.g., *Bouie v. Columbia*, 378 U.S. 347, 84 S.Ct.

1697, 12 L.Ed.2d 894 (1964); *Prater*, 802 F.2d at 952.

Changes in the Sentencing Guidelines do not deprive defendants of notice that their conduct is unlawful (they do not affect substantive prohibitions) or the range of possible sanctions. Congress sets minimum and maximum penalties, and these, established before the crime occurs, set the boundaries of the wrongdoer's punishment. Before there were guidelines, judges could select a sentence from any part of the statutory range. Defendants had no expectations about where in the range their sentences would fall. A given case could come before the one stiff sentencer on an otherwise lenient bench; the defendant sentenced to the statutory maximum, while others who committed the same crime received probation, had no complaint. If after the crime occurred the only judge in the district retired, and the President replaced a bleeding heart with a nail-eating enforcer, again the defendant had no complaint—for the notice came from the statute and not from the practices of the bench. "No one contemplating criminal activity should be encouraged to rely on the practices of judges, prosecutors, prison officials, or parole boards; that is not the sort of reliance that the prohibition against ex post facto laws ought to protect or does protect." *Prater*, 802 F.2d at 955–56.

So too with the Sentencing Guidelines. The tables at the time of an offense do not notify a would-be criminal that his exposure stops short of the statutory maximum. The judge may give a sentence exceeding the guideline range; if the range goes up, the judge may compensate by selecting a sentence lower in the range or may depart downward. Only a fool uses the raw text of the Sentencing Guidelines to determine whether crime pays; he must take account of departures, plus the substantial uncertainty about the meaning of many parts of the text.

Changing the guidelines after the commission of a crime does not deprive the criminal of notice of the elements of the offense or the statutory limits of punishment. It may upset the expectations of the few would-be wrongdoers who study sentencing practices to determine their risks—though even a small

change in the probability of arrest or prosecution will have a much greater effect on the anticipated punishment than does a change in the guidelines, and no one believes that pouring extra resources into the detection and prosecution of crime violates the ex post facto or due process clause. Unless the ex post facto clause is to be applied to judicial action, and cases from *Calder* to *Marks* to *Prater* are to be overruled, we cannot condemn § 3553(a)(4) under Art. I § 9 cl. 3. And whether a particular alteration in the guidelines exceeds the latitude allowed by the due process clause is not a question that can be answered in the abstract.