**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Derrick A. ANDERSON, Defendant– Appellant.**

**No. 93–3462.**

United States Court of Appeals, Seventh Circuit.

Argued May 19, 1995.

Decided July 26, 1995.

Duane J. Deskins (argued), Office of U.S. Atty., Crim. Div., Barry Rand Elden, Asst. U.S. Atty., Criminal Receiving, Appellate Div., Chicago, IL, for U.S.

Eileen Murphy (argued), Northbrook, IL, for Derrick Anderson.

Before CUDAHY, RIPPLE, and KANNE, Circuit Judges.

RIPPLE, Circuit Judge.

Derrick Anderson challenges his conviction for possessing piperidine, knowing or having reasonable cause to believe that it would be used to manufacture phencyclidine in violation of 21 U.S.C. § 841(d)(2). He also challenges his sentence on the ground that the district court erred in ordering a two-point enhancement for possessing a firearm. We affirm.

# I

## BACKGROUND

### A. *Facts*

From June 1989 until December 1991, Derrick Anderson ordered equipment and chemicals from two chemical supply companies, Fisher Scientific and Aldrich Chemical Co. On numerous occasions, Mr. Anderson ordered the chemical piperidine. He also obtained benzene, cyclohexanone, ether, potassium cyanide, phenyl magnesium bromide, storage containers, and a triple beam balance. Piperidine is a "listed precursor chemical" under the Chemical Diversion and Trafficking Act, 21 U.S.C. § 802(34)(J). When combined with hydrochloric acid, cyclohexanone, and a cyanide compound, piperidine produces 1–piperidinocyclohexane carbonitrile (PCC). PCC is a precursor, or essential building block, used to manufacture the controlled substance phencyclidine (PCP). PCC crystals are dried and dissolved in a solvent, such as ether or benzene. As the crystals dissolve, a "gringard reagent," such as phenyl magnesium bromide, and water are added to produce PCP.

In addition to their potential illicit use, many of the chemicals Mr. Anderson ordered are hazardous. To help ensure that the chemicals were being used safely and legitimately, the chemical suppliers asked Mr. Anderson to certify that the materials were for laboratory use only. Mr. Anderson's orders listed the buyer as "Chemical Testing Corporation," or "CTC." Mr. Anderson listed the company address as "152 Northwest Highway, Suite 1100, Department C–20." He claimed the company was located in an industrial park. He also submitted information that purported to be from a chemist at CTC who was qualified to handle the chemicals. Chemical Testing Corporation did not exist. Although Mr. Anderson operated a firm known as "CTC," its initials stood for "Chicago Travel Company." The shipping address Mr. Anderson provided corresponded to "Parcel Service Center," a private mailbox firm located in Palatine, Illinois.

The Drug Enforcement Administration became suspicious of CTC's activities. The DEA determined that the chemicals Mr. Anderson was acquiring could be used to manufacture only PCP. It also discovered that Chemical Testing Corporation did not exist. In December 1991, the DEA learned that Mr. Anderson had placed an order for phenyl magnesium bromide. Agents staked out the Parcel Service Center. In the early evening hours of December 12, 1991, a Chevy Blazer arrived at the scene. Mr. Anderson, who was a passenger in the vehicle, exited the Blazer, entered the building and returned with a package. He then removed the exterior packaging and climbed back into the Blazer. Agents followed the vehicle and eventually pulled it over. They arrested the driver, William Martin, Jr., as well as Mr. Anderson. Inside the Blazer, agents found bottles of phenyl magnesium bromide in the same compartment as a loaded .32 caliber revolver.

## B. *Earlier Proceedings*

Mr. Anderson was tried and convicted on twenty counts of "knowingly or intentionally" possessing piperidine "knowing or having reasonable cause to believe" it would be used to manufacture a controlled substance. 21 U.S.C. § 841(d)(2).[1] He was sentenced September 10, 1993. The district court, without objection, used the 1992 version of the Sentencing Guidelines, which were in effect at that time. Pursuant to U.S.S.G. § 2D1.11(b)(1), the district court ordered Mr. Anderson's sentence enhanced two points because he possessed a firearm. Mr. Anderson contended that he owned neither the .32 caliber revolver nor the Chevy Blazer in which it was found. He emphasized that his fingerprints were not found on the gun. The district court rejected Mr. Anderson's arguments, reasoning that Mr. Anderson "couldn't have not known that that gun was in that compartment." R. 107 at 20. Mr. Anderson's criminal history category of I and his base offense level of 30 generated a sentencing range of 97–121 months. He was sentenced to 120 months' imprisonment.

## II

## DISCUSSION

### A. *Challenges to the Conviction*

Mr. Anderson raises several challenges to his conviction. First, he contends that there was insufficient evidence to support a conviction under 21 U.S.C. § 841(d)(2). Second, he claims that the grand jury proceedings were flawed because the prosecutor informed the grand jury that "in and of itself" it was illegal for Mr. Anderson "to have" piperidine. Mr. Anderson argues that this remark suggested that he could be indicted for simple possession. He also submits that his trial counsel rendered ineffective assistance by not raising this claim in the district court. Next, Mr. Anderson submits that the district court erred in allowing a government witness to testify generally about clandestine PCP labo-

raties. He additionally claims that his trial counsel rendered ineffective assistance by failing to request a limiting instruction and by failing to call expert witnesses in rebuttal. Finally, Mr. Anderson submits that the prosecutor's closing argument was improper. He adds a claim that his trial counsel rendered ineffective assistance in failing to object to the allegedly improper remark. We consider each of these arguments in turn.

### 1. Sufficiency of the Evidence

■ We turn first to Mr. Anderson's claim that there was insufficient evidence to convict him under 21 U.S.C. § 841(d)(2). A defendant who challenges a conviction on the ground of insufficient evidence bears a heavy burden. *United States v. Hubbard*, 22 F.3d 1410, 1414 (7th Cir.1994), *cert. denied*, — U.S. —, 115 S.Ct. 762, 130 L.Ed.2d 660 (1995). In reviewing for sufficiency of the evidence, we consider "the evidence and accompanying inferences in the light most favorable to the government. We shall not disturb the jury's finding unless the record is devoid of any evidence from which a jury could find guilt beyond a reasonable doubt." *United States v. Sandoval–Curiel*, 50 F.3d 1389, 1392 (7th Cir.1995) (citing *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979)).

■ Mr. Anderson argues that the government was required to present direct evidence either that a manufacturing facility existed or that Mr. Anderson "himself intended to manufacture PCP." Appellant's Br. at 16. However, the government was not required to prove that the piperidine Mr. Anderson possessed actually was used to manufacture PCP, *United States v. Green*, 779 F.2d 1313, 1319 (7th Cir.1985), and was entitled to prove its case using circumstantial evidence, *see United States v. Benbrook*, 40 F.3d 88, 94 (5th Cir.1994) (discussing means of establishing possession under section

---

1. Section 841(d) provides, in relevant part:
 Any person who knowingly or intentionally—
 (2) possesses or distributes a listed chemical knowing, or having reasonable cause to believe, that the listed chemical will be used to

manufacture a controlled substance except as authorized by this title;
shall be fined in accordance with Title 18, or imprisoned not more than 10 years, or both.
21 U.S.C. § 841(d)(2).

841(d)(2)).[2] At trial, Mr. Anderson admitted that he possessed over 20 kg of piperidine, as well as the other chemicals and equipment. The government introduced evidence that Mr. Anderson submitted false certifications to two chemical supply companies in order to procure these materials; he claimed the chemicals would be used by a non-existent company and would be handled by a certified chemist. The evidence indicated that Mr. Anderson once reduced the amount of piperidine he had requested in a particular order to avoid having a report sent to the DEA. It also demonstrated that he had the chemicals shipped, not to an industrial park as he claimed, but to a private mail box firm located many miles from his residence. Melvin Schabilion, a group supervisor of the DEA's Clandestine Lab Enforcement Team, testified that PCP traffickers and manufacturers often order chemicals from multiple suppliers and route orders to fictitious addresses to avoid detection. Agent Schabilion also noted that approximately ninety-five percent of the items Anderson acquired could be used, in combination, to manufacture only PCP. DEA forensic chemist Terry Dal Cason identified nine distinct periods in which Mr. Anderson obtained nearly all the ingredients needed to manufacture PCP. He also ex-plained that, although Anderson never ordered hydrochloric acid, this substance could be purchased at a local hardware store or even derived from toilet bowl cleaner. Rick Mitchem, a college friend of Mr. Anderson, testified that, on one occasion, third parties threatened to shoot Mr. Anderson's business associate because he had not supplied them with chemicals. Finally, Peter Jessup, a chemist at Unocal Corporation with a Ph.D in Organic Chemistry and experience creating racing fuels, refuted the claim that the materials Mr. Anderson ordered could be used to make racing fuel. The jury was entitled to rely upon this direct and circumstantial evidence to conclude that Mr. Anderson, at a minimum, "had reasonable cause to believe" that the piperidine he possessed would be used to manufacture PCP. This conclusion permits conviction under 21 U.S.C. § 841(d)(2).[3]

## 2. Grand Jury Proceedings

■ We turn next to Mr. Anderson's claim that the grand jury proceedings were tainted by prosecutorial misconduct. During the grand jury proceedings, DEA Special Agent Jeffrey Felton testified that William Martin, Jr. had told arresting officers that he could take them to a PCP laboratory. The prose-

2. Mr. Anderson suggests that any interpretation of section 841(d)(2) that makes illegal the "mere possession of a suspicious collection of chemicals" would be unconstitutionally overbroad. We need not consider this contention because the government does not rely merely upon the fact that Mr. Anderson possessed a "suspicious collection of chemicals." It also emphasizes, as it did at trial, the evidence that Mr. Anderson acquired the chemicals using deceptive means and that his collection of chemicals had no use other than to manufacture PCP. In short, the government's argument is that the evidence establishes that Mr. Anderson knowingly possessed piperidine "knowing or having reasonable cause to believe" it would be used to manufacture PCP.

3. *United States v. Weston*, 4 F.3d 672 (8th Cir. 1993), upon which Mr. Anderson principally relies, does not suggest the opposite. In *Weston*, the court reversed a conviction under 21 U.S.C. § 841(d)(1), for possession with intent to manufacture, on the ground of insufficient evidence. The court reasoned that the only evidence presented against the defendant was an undercover agent's subjective belief that the defendant would use methylamine the agent sold to him to manu-facture methamphetamine. *See* 4 F.3d at 675. The court noted that, although additional chemicals were needed to convert the methylamine to methamphetamine, there was no evidence that the defendant possessed these chemicals or any manufacturing equipment. *Id.* Thus, the court concluded, "[o]n the record presented ... it would require pure guess-work by the jury to conclude that Weston planned to become directly or indirectly involved in the manufacture, rather than supplying someone else who would likely manufacture methamphetamine." *Id.* This case, unlike *Weston*, was prosecuted under 21 U.S.C. § 841(d)(2), which permits conviction for possessing a listed chemical knowing or having reasonable belief that it will be *used* to manufacture a controlled substance. The Eighth Circuit's conclusion in *Weston* suggests that the evidence was sufficient to convict Weston under § 841(d)(2). In any event, the evidence in this case, which established not only that Mr. Anderson possessed piperidine, but also that he possessed numerous other chemicals used to manufacture PCP, that he acquired the chemicals surreptitiously, and that he acquired the chemicals in a cyclical pattern that suggested he was distributing them to a manufacturer, was far more substantial than the evidence in *Weston*.

cutor then informed the grand jury that he currently was not relying upon Martin's statement, but that he reserved the right to seek a superseding indictment. The following colloquy then occurred:

MR. FLESSNER (Prosecutor): [I]f you have any questions of the agent about the facts of the case as you have them before you presently or of me about the law, we're certainly happy to answer them.

BY A JUROR:

Q. In the indictment it says possession, but do you have any evidence at all of where he took and compounded these chemicals to make the ultimate drug, if that's feasible?

A. Yes, we have evidence that he picked up on numerous occasions these chemicals that were—

Q. No, no. I understand that. Do you have any evidence where he in some kind of home laboratory mixed these chemicals together to make the ultimate drugs, or is it just that you have an indictment because he was possessing these items and you don't have anything where he was mixing them together?

MR. FLESSNER: I can answer that question. This indictment, because it was piperidine, in and of itself, it's illegal for him to have that. The other evidence as it comes to you, and I will present to you how the law has developed on that, it is a, I guess they call it, there is circumstantial inference that because of the kinds of quantities of chemicals that he has, the laboratory chemists can testify as to the only one possible use of those kinds of chemicals.

*See* R. 73, App. at 19–20; Appellee's App. at 19–20. After some additional questioning, the grand jury returned an indictment on all counts. Prior to trial, Mr. Anderson filed a handwritten motion seeking to dismiss the indictment on the ground that the prosecutor had misinstructed the grand jury on the ap-

plicable law. The district court rejected the motion without prejudice and directed Mr. Anderson to proceed through his attorney. R. 77. Mr. Anderson's trial counsel did not move to dismiss the indictment.

■ Mr. Anderson claims that the prosecutor's statement that "in and of itself, it [was] illegal for [Mr. Anderson] to have [piperidine]," misinstructed the grand jury on the applicable law. Mr. Anderson's trial counsel failed to renew this claim as directed by the district court. *See* Fed.R.Crim.P. 12(b)(1) (providing that "[d]efenses and objections based on defects in the institution of the prosecution" must be raised prior to trial). Therefore, we review his claim only for plain error. *See United States v. Olano,* ⸺ U.S. ⸺, ⸺ ⸺ ⸺, 113 S.Ct. 1770, 1778– 79, 123 L.Ed.2d 508 (1993); *cf. United States v. Whaley,* 830 F.2d 1469, 1475 (7th Cir.1987) ("Because prosecutorial vindictiveness was not raised prior to or during the trial, it is deemed waived on appeal unless cause is shown for granting relief from the waiver.") (citing Fed.R.Crim.P. 12(f)), *cert. denied,* 486 U.S. 1009, 108 S.Ct. 1738, 100 L.Ed.2d 202 (1988).

■ "[A]s a general matter, a district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants." *Bank of Nova Scotia v. United States,* 487 U.S. 250, 254, 108 S.Ct. 2369, 2373, 101 L.Ed.2d 228 (1988).[4] This general rule encompasses claims of prosecutorial misconduct during the grand jury proceedings. *See id.* at 255, 263, 108 S.Ct. at 2373–74, 2378. Prejudice occurs if a "violation substantially influenced the grand jury's decision to indict, or if there is grave doubt that the decision to indict was free from the substantial influence" of the violation. *Id.* at 256, 108 S.Ct. at 2374 (quotation and citation omitted).

Applying these principles, we cannot say that the record makes it clear that the prosecutor's lack of precision had the effect of

---

4. Although prejudice need not be shown when "the structural protections of the grand jury have been so compromised as to render the proceedings fundamentally unfair," *Bank of Nova Scotia,* 487 U.S. at 257, 108 S.Ct. at 2374–75, Mr. Anderson raises no such claim. *Cf. Vasquez v. Hillery,* 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d

598 (1986) (holding that racial discrimination in selection of grand jurors compelled dismissal of indictment). Likewise, there is no allegation of systemic and pervasive prosecutorial misconduct before the grand jury that might allow a presumption of prejudice. *See Bank of Nova Scotia,* 487 U.S. at 259, 108 S.Ct. at 2375–76.

misinforming the jury on the applicable law. The prosecutor told the grand jury that it was illegal for Mr. Anderson "to have" piperidine after a grand juror asked whether there was evidence of a manufacturing facility. In context, the juror's question suggested that the grand juror may have been confused by Agent Felton's testimony concerning the existence of a PCP laboratory. The prosecutor's remark focused the grand jury upon the charge in the indictment—possession of piperidine having the knowledge or reasonable belief that it would be used to manufacture PCP. The full text of his statement can most reasonably be read as informing the juror that the government was relying upon Mr. Anderson's possession as well as the "circumstantial inference" that there was only one use—the manufacture of PCP—for the collection of chemicals Mr. Anderson acquired. Thus, read as a whole, his statement does not appear misleading.

 In any event, the remark did not prejudice Mr. Anderson. The only potential prejudice is that Mr. Anderson may have been indicted without probable cause. However, the fact that he subsequently was convicted by a petit jury of the same charge demonstrates that "any error in the grand jury proceeding connected with the charging decision was harmless beyond a reasonable doubt." *See United States v. Mechanik,* 475 U.S. 66, 70, 106 S.Ct. 938, 941–42, 89 L.Ed.2d 50 (1986); *see also United States v. McKie,* 831 F.2d 819, 821–22 (8th Cir.1987) (per curiam) (rejecting claim that grand jury's charging decision was influenced improperly by prosecutor's comment on sentencing practices in light of petit jury's guilty verdict).[5]

### 3. Testimony of DEA Experts

#### a.

 We now consider Mr. Anderson's claim that the district court erred in allowing

government expert Melvin Schabilion to testify about the existence of clandestine PCP laboratories. We review the district court's decision to admit expert testimony for abuse of discretion. *United States v. Amaechi,* 991 F.2d 374, 377 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 2980, 125 L.Ed.2d 677 (1993); *United States v. Solis,* 923 F.2d 548, 550 (7th Cir.1991). Under the Federal Rules of Evidence, a district court may permit an individual qualified as an expert "by knowledge, skill, experience, training, or education" to testify if it determines that "scientific, technical, or other specialized knowledge will assist the trier of fact" in understanding the evidence or determining a fact in issue. Fed.R.Evid. 702; *see Solis,* 923 F.2d at 550. In deciding whether expert testimony will be helpful, the district court must evaluate "the state of knowledge presently existing about the subject of the proposed testimony in light of its appraisal of the facts of the case." *United States v. Brown,* 7 F.3d 648, 652 (7th Cir.1993) (quotation and citation omitted); *see also Solis,* 923 F.2d at 550 (noting that "helpfulness" analysis subsumes a "relevancy analysis"). As we noted in *Brown,* "[b]ecause courts have recognized that the average juror is unlikely to be knowledgeable about drug trafficking, they consistently have allowed expert testimony concerning the 'tools of the trade' and the methods of operation of those who distribute various types of illegal narcotics." 7 F.3d at 652 (collecting cases). Experts also have been permitted to comment on the typical behavior patterns of drug users and distributors. *See United States v. Foster,* 939 F.2d 445, 451 & n. 6 (7th Cir.1991) (collecting cases).

Mr. Anderson does not dispute that Agent Schabilion, a group supervisor of the DEA's

---

**5.** In light of our discussion in the text, it is unnecessary to examine at length Mr. Anderson's alternative argument that his trial counsel rendered ineffective assistance by failing to challenge his indictment. Such claims are governed by the "cause" and "prejudice" standards set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Mr. Anderson could not show that his trial counsel's performance "fell below an objective standard of reasonableness," *see id.* at 688, 104 S.Ct. at 2064–65, when she failed to challenge the indictment on the basis of a single prosecutorial remark taken out of context. Moreover, his subsequent conviction establishes that there was no "reasonable probability" that the result of the proceeding would have been different but for for his trial counsel's alleged error. *See id.* at 694, 104 S.Ct. at 2068.

Clandestine Lab Enforcement Team with specialized training in clandestine laboratory operations and twenty-five years of experience, was qualified to provide expert testimony. *See United States v. Gonzalez,* 933 F.2d 417, 428 (7th Cir.1991) ("[F]ederal agents trained and experienced in drug-related transactions, crimes and prosecution are qualified to give expert testimony concerning the practices of those engaged in this type of criminal activity."). Rather, Mr. Anderson contends that there was no factual basis for Agent Schabilion's testimony concerning "clandestine PCP laboratories." Mr. Anderson also submits that the probative value of this testimony did not outweigh its prejudicial effect.

Agent Schabilion testified at length about how PCP was made. He explained that approximately ninety-five percent of the chemicals Mr. Anderson acquired could be used, in combination, to make only PCP. He also discussed the methods offenders used to avoid detection. These artifices include ordering supplies from multiple suppliers, using a false shipping address, and delegating the responsibility for collecting chemicals and manufacturing the final product to different individuals. Agent Schabilion later explained that the actual manufacturing site could be quite small:

> Anyplace [sic] the imagination can come up with, can conceive, there has been a clandestine laboratory there and they have been inside of cars, inside of trucks, in the country, forest preserves, out in the middle of a field, industrial buildings, out on boats.... A five gallon bucket and a broom handle is one of the most successful laboratories I have come across.

Tr. II at 136.

■ The district court did not abuse its discretion in allowing this testimony. Agent Schabilion's testimony aided the jury's understanding of the PCP manufacturing process. He did not speak to matters that the jury could evaluate for itself, *cf. Foster,* 939 F.2d at 452, but merely helped the jury in interpreting the significance of the evidence presented concerning Mr. Anderson's means of acquiring materials that could be used to manufacture PCP. The testimony thus aided

the jury in evaluating whether Mr. Anderson possessed piperidine legitimately rather than with the knowledge or reasonable belief that it would be used to manufacture PCP. *See Brown,* 7 F.3d at 652 (noting that expert testimony is helpful when it allows average jurors to understand the evidence and resolve critical issues). Agent Schabilion did not suggest either that Mr. Anderson knew of a hidden laboratory or that one existed; he simply commented that such facilities need not be elaborate. Although this information was general, it was outside the common experience of the jurors. Accordingly, the government was permitted to supply it through expert testimony. *See Brown,* 7 F.3d at 652; *Foster,* 939 F.2d at 451. Furthermore, the probative value of Agent Schabilion's testimony outweighed its prejudicial effect. The testimony assisted the jury in resolving the ultimate question of whether Mr. Anderson innocently had acquired his chemicals and equipment or whether he had acquired them with knowledge or reason to believe that they would be used to make PCP. In addition, the district court instructed the jury that "the fact that an expert has given an opinion does not mean that it is binding upon you or that you are obligated to accept the expert's opinion as to the facts." Tr. IV at 422. This instruction "adequately mitigated" any danger of unfair prejudice that may have resulted from Agent Schabilion's testimony. *See Brown,* 7 F.3d at 655 & n. 4 (citations omitted).

b.

■ Mr. Anderson also contends that his counsel rendered ineffective assistance by failing to request a limiting instruction with respect to expert testimony and by failing to call rebuttal expert witnesses. These claims are without merit. The district court did provide a limiting instruction with respect to expert testimony. Tr. IV at 422. The record demonstrates that Mr. Anderson's trial counsel conducted a rigorous cross-examination of the government's experts. Neither the record nor Mr. Anderson suggests how his purported rebuttal witnesses would have testified or how they could have changed the result in this case. Accordingly, we cannot

conclude that Mr. Anderson's trial counsel rendered ineffective assistance by failing to call these unnamed witnesses. *See, e.g., United States v. Jackson,* 33 F.3d 866, 875 (7th Cir.1994) (rejecting ineffective assistance claim based upon trial counsel's failure to call witnesses at trial where record did not indicate how witnesses would have testified and noting that such claims are properly raised under 28 U.S.C. § 2255) (collecting cases), *cert. denied,* —— U.S. ——, 115 S.Ct. 1316, 131 L.Ed.2d 197 (1995); *United States v. Ellis,* 23 F.3d 1268, 1274 (7th Cir.1994) (same); *see also United States v. Ashimi,* 932 F.2d 643, 650 (7th Cir.1991) (indicating that self-serving speculation concerning putative witness' testimony will not sustain ineffective assistance claim).

### 4. Closing Argument

#### a.

▮ At the close of evidence, the defense asked the jury to consider the impact its decision would have on Mr. Anderson. In rebuttal, the prosecutor stated:

> I suggest to you ladies and gentleman that the defendant's decision himself [sic] has had an impact as well. The impact that that decision has had is on the lives and families and people of this country who have been ruined by drugs. When he involved himself in the production, the illegal production of phencyclidine, of PCP, he has ruined literally thousands and thousands of lives.

Tr. IV at 406. Mr. Anderson contends that the prosecutor's argument was improper and deprived him of a fair trial. Because his trial counsel did not object to the remark, we review Mr. Anderson's claim for plain error only. *United States v. Cole,* 41 F.3d 303, 309 (7th Cir.1994), *petition for cert. filed,* (U.S.

May 1, 1995) (No. 94–9073); *see also United States v. Young,* 470 U.S. 1, 15–16, 105 S.Ct. 1038, 1046–47, 84 L.Ed.2d 1 (1985). We apply a two-part test to claims of prosecutorial misconduct in closing argument. First, "we consider the prosecutor's disputed remarks in isolation to determine whether they are improper. If they are, we then consider the remarks in the context of the entire record and assess whether they had the effect of denying the defendant a fair trial." *United States v. Johnson–Dix,* 54 F.3d 1295, 1304 (7th Cir.1995) (citations omitted). The latter inquiry involves consideration of the nature and seriousness of the statement, whether it was invited, whether the defense had an opportunity to rebut the remark, whether the district court instructed the jury to disregard such statements, and whether the weight of the evidence was against the defendant. *Id.*

▮ Mr. Anderson contends that the prosecutor overstepped his bounds by asserting that Mr. Anderson had ruined "literally thousands and thousands of lives." As the government notes, we have permitted prosecutors to comment upon the impact the drug trade has on society.[6] However, this particular comment by the prosecutor implied that Anderson personally had ruined thousands of lives, even though the government introduced no evidence to support such a claim. (Indeed, as we noted earlier, the government was not even required to prove that the piperidine Mr. Anderson possessed was actually used to manufacture PCP.) Viewed in this manner, the remark was improper. *See United States v. Keskey,* 863 F.2d 474, 481 (7th Cir.1988) (noting that closing arguments are limited to the facts in evidence); *United States v. Perez–Leon,* 757 F.2d 866, 875 (7th Cir.) (same), *cert. denied,* 474 U.S. 831, 106 S.Ct. 99, 88 L.Ed.2d 80 (1985). Neverthe-

---

**6.** *See United States v. Zanin,* 831 F.2d 740, 743 (7th Cir.1987) (finding no error where prosecutor asked jury to consider the families to whom defendant sold heroin); *United States v. Zylstra,* 713 F.2d 1332, 1340 (7th Cir.) (same where prosecutor remarked that "Company" was bringing "200,000 pounds of marijuana into our country for distribution to our children and friends"; court construed statement as referring to the drug threat to society as a whole), *cert. denied,* 464 U.S. 965, 104 S.Ct. 403, 78 L.Ed.2d 344 (1983); *cf. United States v. Ferguson,* 935 F.2d

1518, 1530–31 (7th Cir.1991) (same where prosecutor stated that jury could "make a difference in the fight against drugs"); *United States v. Peco,* 784 F.2d 798, 810 (7th Cir.) (stating that court did not condone prosecutor's argument, which included reference to narcotics defendants as "merchants in death," but noting that the government may comment upon the gravity of the drug problem and that argument's overall impact on jury was minimal), *cert. denied,* 476 U.S. 1160, 106 S.Ct. 2281, 90 L.Ed.2d 723 (1986).

less, when considered in light of the entire record, the remark did not result in a "miscarriage of justice" requiring reversal under our plain error standard of review. *See Cole*, 41 F.3d at 309 (quotation and citations omitted); *see also Young*, 470 U.S. at 15, 105 S.Ct. at 1046. The evidence against Mr. Anderson was strong. Moreover, following closing arguments, the district court instructed the jury that "[o]pening statements, closing arguments, and other statements of counsel should be disregarded to the extent that they are not supported by the evidence." Tr. IV at 418. We have held such an instruction "sufficient to overcome any prejudicial effect" arising from prosecutorial statements that were unsupported by the evidence. *See United States v. Herrera*, 54 F.3d 348, 356 (7th Cir.1995); *see also United States v. Jean*, 25 F.3d 588, 597–98 (7th Cir.1994) (noting that similar instruction, given in response to defense counsel's objection to allegedly improper closing argument, limited the impact of the remark). Accordingly, we find no plain error.

b.

■ Mr. Anderson alternatively submits that his trial counsel rendered ineffective assistance by failing to object to the prosecutor's argument. We cannot accept this contention because we cannot conclude that Mr. Anderson was prejudiced. *See Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984) (holding that conviction will not be reversed unless there is a reasonable likelihood that, but for attorney's errors, the result of the proceeding would have been different). In *United States v. Van Wyhe*, 965 F.2d 528 (7th Cir. 1992), we considered whether a prosecutor's closing argument that a defendant had dealt, and would continue to deal, cocaine was improper because it was not based upon the facts in evidence. The defense had objected to the remark and the district court had sustained the objection. The court also had admonished the jury to disregard the remark and had instructed the jury that arguments of counsel were not evidence and that the government bore the burden of proof. *See id.* at 533. We held that any error arising from the prosecutor's remark "was harmless considering that the jurors were subsequently instructed that the arguments of counsel should not be considered as evidence and that the government had the burden of proof." *Id.* As in *Van Wyhe*, the district court instructed the jury that the arguments of counsel were not to be considered evidence and that the government bore the burden of proof. Tr. IV at 418, 420–21. The jury is presumed to follow such instructions. *Van Wyhe*, 965 F.2d at 533. Thus, in light of the district court's instructions, as well as the weight of the evidence against Mr. Anderson, we cannot say that the result of the trial would have been different had his trial counsel objected to the prosecutor's remark.

B. *Challenges to Sentencing*

Mr. Anderson challenges the two-point firearm enhancement he received under U.S.S.G. § 2D1.11(b)(1). He submits that the district court violated the Ex Post Facto Clause by applying the firearm enhancement guideline in effect at sentencing (1992 Guidelines) rather than a more lenient version that was in effect at the time he committed his offense (1990 Guidelines). He recognizes that the 1992 Guidelines authorize a significantly lower base offense level for the amount of piperidine he possessed. He therefore submits that the 1992 Guidelines be used for that purpose but that the 1990 Guidelines be used for the firearms enhancement. In the alternative, he submits that the firearm enhancement was improper under the 1992 Guidelines because there was no evidence that he possessed the gun found in the Chevy Blazer.

The government notes that Mr. Anderson never objected to being sentenced under the 1992 Guidelines. Next, it submits that a defendant may be sentenced under only one version of the Guidelines; it is improper to apply certain provisions from one version of the Guidelines and other provisions from another version. It then notes that the overall effect of the relevant guideline amendments was to subject Mr. Anderson to a much lower sentence under the 1992 Guidelines than he could have received under the 1990 Guidelines. Therefore, the government concludes, there is no ex post facto problem. With

respect to the alternative argument, the government argues that the district court did not clearly err in ordering the firearm enhancement under the 1992 Guidelines.

### 1.

 We turn first to the ex post facto issue. The Ex Post Facto Clause, U.S. Const. art. I, § 10, prohibits legislation that "retroactively alter[s] the definition of crimes or increase[s] the punishment for criminal acts." *California Dep't of Corrections v. Morales,* ── U.S. ──, ──, 115 S.Ct. 1597, 1601, 131 L.Ed.2d 588 (1995) (quoting *Collins v. Youngblood,* 497 U.S. 37, 43, 110 S.Ct. 2715, 2719–20, 111 L.Ed.2d 30 (1990)) (citations omitted). At the sentencing hearing, however, Mr. Anderson did not challenge the district court's use of the 1992 Guidelines on ex post facto grounds. Therefore, we review his claim only for plain error. *United States v. Aman,* 31 F.3d 550, 557 (7th Cir.1994); *see Olano,* ── U.S. ── – ──, 113 S.Ct. at 1778–79. We have held that a district court commits plain error when it applies the sentencing guidelines in a manner that violates the Ex Post Facto Clause. *See, e.g., Aman,* 31 F.3d at 557; *United States v. Seacott,* 15 F.3d 1380, 1386 (7th Cir.1994).

 The Sentencing Guidelines discuss the interplay between the guidelines and the Ex Post Facto Clause. They provide that courts should use "the Guidelines Manual in effect" on the date of sentencing unless doing so would violate the Ex Post Facto Clause. If the sentencing court determines that using the guidelines in effect on the date of sentencing would violate the Clause, it should use "the Guidelines Manual in effect on the date that the offense of conviction was committed." *See* U.S.S.G. § 1B1.11(a), (b)(1) (1992). Section 1B1.11(b)(2) of the guidelines makes clear that once the sentencing court determines which Manual applies, it must use that Manual exclusively:

> [t]he Guidelines Manual in effect on a particular date shall be applied in its entirety. The court shall not apply, for example, one guideline section from one edition of the Guidelines Manual and another section from an earlier edition of the Guidelines Manual.

U.S.S.G. § 1B1.11(b)(2); *see also* U.S.S.G. § 1B1.11, comment. (n. 1).[7] We, like a substantial number of the circuits, have confirmed that sentencing calculations must be made using only a single Guidelines Manual. *United States v. Lykes,* 999 F.2d 1144, 1149 (7th Cir.1993) (citing *United States v. Boula,* 997 F.2d 263 (7th Cir.1993)); *see also United States v. Corrado,* 53 F.3d 620, 625 (3d Cir. 1995) (collecting cases). The "one book rule," as it is called, prevents defendants from arguing that they should benefit from favorable guideline provisions contained in various Guideline Manuals. *See Boula,* 997 F.2d at 266. Accordingly, Mr. Anderson may not be sentenced, as he claims, under some provisions of the 1990 Guidelines and some provisions of the 1992 Guidelines.[8]

 We now consider whether Mr. Anderson should have been sentenced under the 1990 rather than the 1992 Guidelines. The 1990 Guidelines applied at the time he committed his offense; the 1992 Guidelines were in effect at sentencing. In between, the 1990 Guidelines were amended in two material respects: (1) a language change broadened the scope of the firearm enhancement;[9] (2)

---

7. Although § 1B1.11 was not added to the Guidelines until 1992, the Background Commentary makes clear that the ex post facto provision reflected the existing practice of the courts, which "generally [had] held that the *ex post facto* clause does apply to sentencing guideline amendments that subject the defendant to increased punishment." U.S.S.G. § 1B1.11, comment. (backg'd.).

8. *Cf. Corrado,* 53 F.3d at 625 (reasoning that just as defendant will not be penalized for failing to predict unfavorable changes in guidelines following the time he committed the offense, defendant sentenced under guidelines in effect at the time

of his offense likewise cannot benefit from subsequent beneficial changes as long as the overall effect is not to his detriment); *United States v. Springer,* 28 F.3d 236, 238 (1st Cir.1994) (same).

9. Prior to 1991, no guideline provision corresponded specifically to the crime of unlawfully possessing a listed precursor chemical. The parties agree that the most analogous guideline provision, *see* U.S.S.G. § 1B1.2(a), in the 1990 Guidelines was § 2D1.1, which authorized a two-point sentencing enhancement if "a dangerous weapon (including a firearm) was possessed during the commission of the offense." U.S.S.G. § 2D1.1(b)(1) (1990). Effective November 1,

guideline amendments made the base offense level with respect to piperidine possession far less onerous. Depending upon the conversion formula used, *see* Appellee's App. at 31–39, the piperidine Mr. Anderson acquired converts either to approximately nine or eighteen kilograms of PCP. Under the 1990 Guidelines, these quantities of PCP alone (i.e., without any additional enhancement for possessing a firearm) would produce base offense levels of 168–210 months and 188–235 months, respectively. *See* U.S.S.G. § 2D1.1(c) (1990). By contrast, under the 1992 Guidelines, Mr. Anderson faced a sentencing range of 97–121 months. Comparing the two ranges, it is evident that Mr. Anderson faced no possibility of greater punishment under the 1992 Guidelines. The lowest possible sentence for which he qualified under the 1990 Guidelines, 168 months, far

exceeded the most severe sentence, 121 months, he could have received under the 1992 Guidelines.

Our colleagues in the Tenth Circuit have held, under similar facts, that there is no ex post facto problem when the Guideline Manual in effect at sentencing, taken as a whole, cannot possibly generate a sentence more severe than the most lenient sentence that was available at the time the defendant committed his offense. *See United States v. Nelson*, 36 F.3d 1001, 1004 (10th Cir.1994) (upholding use of 1992 Guidelines even though defendant would have received lower enhancement under 1988 Guidelines because defendant received equivalent reduction in sentence under different provision of 1992 Guidelines). Various decisions from the other circuits comport with this reasoning.[10]

---

1991, § 2D1.1(b)(1) was amended to authorize an enhancement merely if "a dangerous weapon (including a firearm) was possessed."· U.S.S.G. amend. 394. In addition, the Sentencing Commission added § 2D1.11, which addresses specifically the unlawful possession of a precursor chemical. Like the amended version of § 2D1.1, § 2D1.11(b)(1) authorizes a two-point enhancement "if a dangerous weapon (including a firearm) was possessed." U.S.S.G. § 2D1.11(b)(1) (1992). We have noted that deletion of the "during the commission of the offense" language from § 2D1.1(b)(1) "expanded the scope and applicability of the weapons enhancement." *United States v. Mumford*, 25 F.3d 461, 469 (7th Cir.1994); *see also United States v. Baldwin*, 956 F.2d 643, 647 n. 4 (7th Cir.1992) (stating that amendment "change[d] government's burden," and noting that in cases decided under the amended guideline "the government will not be required to show that the defendant possessed the dangerous weapon during the offense of conviction"). For purposes of our analysis here, we shall assume that Mr. Anderson would be ineligible for the enhancement under the 1990 Guideline because there was no evidence indicating that he possessed a firearm during the commission of his offense of possessing piperidine in violation of 21 U.S.C. § 841(d)(2).

**10.** *See United States v. Lenfesty*, 923 F.2d 1293, 1299 (8th Cir.) ("Because the net sentencing range under the Guidelines in effect when [the defendant] sold crank [methamphetamine] was less than the net sentencing range of the Guidelines in effect at sentencing, the District Court properly began its calculations with the former, less harsh, range."), *cert. denied*, 499 U.S. 968, 111 S.Ct. 1602, 113 L.Ed.2d 665 (1991); *cf. United States v. Fones*, 51 F.3d 663, 669 (7th Cir.1995) (noting that district court applied earlier version of guidelines because the overall of-

fense level calculations under the earlier version "were more beneficial" to the defendant); *United States v. Milton*, 27 F.3d 203, 211 (6th Cir.1994) (noting that defendant's "best interests [were] served" under 1988 Guidelines, where 1992 Guidelines would have generated substantially higher sentencing range despite the existence of a beneficial amendment), *cert. denied*, — U.S. ——, 115 S.Ct. 741, 130 L.Ed.2d 642 (1995); *United States v. Lance*, 23 F.3d 343, 344 (11th Cir.1994) (per curiam) (noting that district court had used version of guidelines in effect at the time offense was committed because, overall, they were less onerous than guidelines in effect at sentencing, rejecting argument that "only the amendment to the Guidelines which offends ex post facto concerns should be considered as of the date the crime was committed," and holding instead that "whichever version is appropriate, the Guidelines in effect on that date should be used in their entirety"); *United States v. Warren*, 980 F.2d 1300, 1304 n. 2 (9th Cir.1992) (avoiding ruling on question whether ex post facto concerns are implicated because a single provision of the Guidelines becomes more onerous or only when the Guidelines as a whole do), *cert. denied*, — U.S. ——, 114 S.Ct. 397, 126 L.Ed.2d 344 (1993).

In *United States v. Seligsohn*, 981 F.2d 1418, 1424 (3d Cir.1992), the Third Circuit refused to apply the "one book rule" in a situation requiring grouping because of ex post facto concerns. The court subsequently indicated that, although the "one book rule" may not compel application of the Guidelines Manual in effect on the date of sentencing, it could compel application of the Manual in effect on the date the offense of conviction was committed. *See United States v. Bertoli*, 40 F.3d 1384, 1404 n. 17 (3d Cir.1994). In *Bertoli*, the court also commented in dictum upon the precise situation that confronts us in

The Supreme Court's teachings in *Miller v. Florida*, 482 U.S. 423, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987) are also supportive of this approach. In *Miller*, the Court concluded that an amendment to Florida's sentencing guidelines violated the Ex Post Facto Clause by increasing the petitioner's presumptive sentence after he had committed the offense of conviction. The Court began its discussion by noting that "[i]t is axiomatic that for a law to be *ex post facto* it must be more onerous than the prior law." *Id.* at 431, 107 S.Ct. at 2452 (quotation and citation omitted). Addressing the Florida sentencing guidelines, the Court noted that the amendment at issue disadvantaged the petitioner; it then commented that "[c]onsidering the revised guidelines law *as a whole*" did not change the result because the State was unable "to identify any feature of the revised guidelines law that could be considered ameliorative." *Miller*, 482 U.S. at 431–32, 107 S.Ct. at 2451–52 (emphasis added); *see also Dobbert v. Florida*, 432 U.S. 282, 294, 97 S.Ct. 2290, 2298–99, 53 L.Ed.2d 344 (1977) (noting that, in evaluating an ex post facto claim, the Court "must compare the two statutory procedures *in toto* to determine if the new may be fairly characterized as more onerous"); *cf. Weaver v. Graham*, 450 U.S. 24, 34–36, 101 S.Ct. 960, 967–68, 67 L.Ed.2d 17 (1981) (hold-ing that statutory provision that reduced retroactively amount of good time reduction to prisoners' sentences was not saved by potentially ameliorative provisions enacted at the same time because their application was purely discretionary).[11]

 The decisions therefore make clear that guideline amendments will not raise ex post facto concerns if, "taken as a whole," they are "ameliorative." *See Miller*, 482 U.S. at 431–32, 107 S.Ct. at 2451–52.[12] In light of this principle, it is clear that the district court did not err in applying the 1992 Guidelines.

### 2.

 We now consider whether the district court erred in applying the firearm enhancement authorized by section 2D1.11(b)(2) (1992).[13] We review the district court's finding that Mr. Anderson possessed the .32 caliber revolver for clear error. *United States v. Price*, 54 F.3d 342, 348 (7th Cir.1995); *United States v. Cantero*, 995 F.2d 1407, 1409 (7th Cir.1993). Under the 1992 guidelines, the government is not required to prove that Mr. Anderson possessed the gun during the commission of his offense of conviction. *Price*, 54 F.3d at 348; *United States*

---

this case: "it is possible that changes in the guidelines after an offense might both help and hurt the defendant. In such a situation a defendant might not be able to object to the use of a Guideline Manual adopted after an offense on ex post facto grounds if overall the amendments favored him." *Id.* Recently, the Third Circuit has commented that "[i]n our view, where, as here, the applicable guidelines overall work to the defendant's advantage in terms of the sentence imposed, there is no ex post facto violation." *See Corrado*, 53 F.3d at 625 (district court had applied earlier version of guidelines and defendant argued that he should have benefitted from favorable amendment in subsequent guidelines).

11. In *Miller*, the Court also commented on its decision in *Lindsey v. Washington*, 301 U.S. 397, 57 S.Ct. 797, 81 L.Ed. 1182 (1937), which permitted an ex post facto challenge to a law that had changed the penalty for a statutory violation from an indeterminate sentence of six months to fifteen years to a mandatory fifteen-year sentence. The Court noted that, in light of *Lindsey*, "one is not barred from challenging a change in the penal code on *ex post facto* grounds simply because the sentence he received under the new

law was not more onerous than that which he *might* have received under the old." *Miller*, 482 U.S. at 432, 107 S.Ct. at 2452 (quotation and citation omitted) (emphasis added); *cf. Morales*, — U.S. at ——, 115 S.Ct. at 1603 n. 6 (citing *Lindsey* and noting, "a party ... need not carry the burden of showing that he would have been sentenced to a lesser term under ... the range of punishments in place under the previous statutory scheme").

12. Our decision in *United States v. Seacott*, 15 F.3d 1380 (7th Cir.1994) is not to the contrary. In *Seacott*, we stated the general rule that "the Ex Post Facto Clause ... prohibits application of a guidelines provision not in effect on the date of the offense if the new provision operates to the detriment of the defendant." *Id.* at 1384 (quotation and citation omitted). We had no need to consider the case law discussing the interplay between the "one book rule" and the Ex Post Facto Clause.

13. There is a dearth of case law interpreting this guideline. Accordingly, we shall seek guidance from the cases interpreting U.S.S.G. § 2D1.1(b)(1), which contains identical language.

*v. Mumford,* 25 F.3d 461, 468 (7th Cir.1994); *United States v. Montgomery,* 14 F.3d 1189, 1199 n. 10 (7th Cir.1994). Rather, the enhancement may be applied if Mr. Anderson possessed the gun during the course of related relevant conduct. *Mumford,* 25 F.3d at 468; *United States v. Falesbork,* 5 F.3d 715, 721 (4th Cir.1993); *United States v. Vaquero,* 997 F.2d 78, 85 (5th Cir.), *cert. denied,* ── U.S. ──, 114 S.Ct. 614, 126 L.Ed.2d 578 (1993); *see* U.S.S.G. § 1B1.3.[14] The commentary to section 2D1.11 provides that the enhancement "should be applied if the weapon was present unless it is improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.11, comment. (n. 1); *cf.* U.S.S.G. § 2D1.1, comment. (n. 3) (stating that it must be "clearly improbable" that weapon was connected with the offense).

The evidence at sentencing established that the phenyl magnesium bromide bottles which Mr. Anderson picked up at the Parcel Service Center were found in the same interior compartment of the Chevy Blazer as the .32 caliber revolver. Thus, even though Mr. Anderson was not the registered owner of either the Chevy Blazer or the firearm, the district court did not clearly err in concluding that Mr. Anderson knew the firearm was present. Likewise, because the record supports the conclusions (1) that Mr. Anderson knew of the gun's presence and easy accessibility and (2) that he had exercised control over the very compartment in which the firearm was discovered, the district court did not clearly err in finding that Mr. Anderson constructively possessed the weapon. *See United States v. Rush,* 890 F.2d 45, 52 (7th Cir. 1989) (affirming enhancement under earlier version of section 2D1.1(b)(1) where defendant knew firearm was in automobile for which defendant had the keys and toward which defendant was headed, even though defendant was not in the automobile at the time); *see generally United States v. Garrett,* 903 F.2d 1105, 1111 (7th Cir.1990) (noting, in case involving conviction for possessing a firearm in violation of 21 U.S.C. § 922(g), that constructive possession exists when a person "knowingly has the power and intention at a given time to exercise dominion and control over an object") (quotation and citation omitted), *cert. denied,* 498 U.S. 905, 111 S.Ct. 272, 112 L.Ed.2d 227 (1990).[15] More-

---

**14.** *Mumford* held that the § 2D1.1 firearm enhancement applied to defendants who are "accountable for the possession of a weapon by a coconspirator during drug trafficking conduct relevant to the offense of conviction, of which the defendant was charged but not convicted, even where the weapon was not present during the offense of conviction." 25 F.3d at 468. However, the relevant conduct inquiry is not limited to offenses for which a defendant was charged but not convicted. *United States v. Hatchett,* 31 F.3d 1411, 1419 (7th Cir.1994); *United States v. Tucker,* 20 F.3d 242, 245 (7th Cir.1994); *see also United States v. Tejada–Beltran,* 50 F.3d 105, 110 (1st Cir.1995) ("Relevant conduct is not limited to the counts of conviction. It may include acts that were embodied in counts originally charged but later dropped, *and acts that were never charged at all.*") (internal citations omitted) (emphasis added); U.S.S.G. § 1B1.3, comment. (backg'd.) ("Conduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable sentencing guideline range."). *Mumford* itself notes that its particular analysis focused on "the circumstances presented," *id.,* and that, generally, sentencing enhancements are determined on the basis of all "acts and omissions which are related to the conduct for which the defendant was convicted." *Id.*

**15.** *Cf. United States v. Kitchen,* 57 F.3d 516, 522 (7th Cir.1995) (noting, in statutory firearm possession case, that "[t]he law recognizes the possibility of joint possession"); *United States v. Cochran,* 14 F.3d 1128, 1132 (6th Cir.1994) (stating that, for a defendant to be held in constructive possession of a firearm, "at a minimum, we require that there be objective evidence that the defendant knew the weapon was present, or at least knew it was reasonably probable that his coconspirator would be armed"; the court reversed an enhancement under § 2D1.1(b)(1) because the record did not indicate that the defendant-passenger knew firearm hidden under driver's seat was present); *United States v. Kelso,* 942 F.2d 680, 682 (9th Cir.1991) (reasoning that enhancement under § 2D1.1(b)(1) on constructive possession theory is appropriate where evidence demonstrates that defendant had sufficient connection with firearm to support inference that defendant exercised control over it).

We do not intend for our discussion in the text to imply that knowledge of a firearm's actual presence is required in all cases involving enhancements under §§ 2D1.1(b)(1) or 2D1.11(b)(1). *See United States v. Fiala,* 929 F.2d 285, 289 (7th Cir.1991) (noting that, after November 1989, there no longer was a scienter requirement for enhancement under § 2D1.1(b)(1)). We refer to Mr. Anderson's knowledge in this case because that was the basis for the district court's decision.

over, on this record, we cannot say that it was "improbable" that the firearm was connected with Mr. Anderson's offense. *See* U.S.S.G. § 2D1.11, comment. (n. 1). Mr. Anderson possessed the gun while in a vehicle that was being used to transport materials useful in the manufacture of PCP. *Cf. Cantero*, 995 F.2d at 1411 (rejecting claim that it was "clearly improbable" that handgun was connected to drug offense and recognizing that "a handgun is a tool of the [drug] trade because it is very easy to conceal yet deadly") (quotation and citation omitted); *United States v. Nunez*, 958 F.2d 196, 200 (7th Cir.) (stating that "the type [two handguns] and location [home of defendant where cocaine was discovered] of the seized guns suggests that they were used in connection with [the defendant's] drug business"), *cert. denied*, —— U.S. ——, 113 S.Ct. 168, 121 L.Ed.2d 115 (1992). Accordingly, we cannot conclude that the district court committed clear error in ordering the two-point enhancement under U.S.S.G. § 2D1.11(b)(1).

### Conclusion

For the foregoing reasons, Mr. Anderson's conviction and sentence are affirmed.

AFFIRMED